**Ronald DEFINO and John Eyre,**
**Plaintiffs/Appellants,**

v.

**CIVIC CENTER CORPORATION and**
**Sportservice Corporation,**
**Defendants/Respondents.**

**No. 55482.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Oct. 17, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 15, 1989.

Theodore F. Schwartz, Barry S. Ginsburg, Clayton, for plaintiffs/appellants.

Frank N. Gundlach, Alan C. Kohn, St. Louis, for respondent.

SATZ, Judge.

Plaintiffs appeal the trial court's grant of defendants' motions for summary judgments. We affirm.

Plaintiffs are self-employed street vendors. Defendants are Civic Center Corporation (Civic Center) and Sportservice Corporation (Sportservice). Civic Center owns and operates Busch Stadium in downtown St. Louis. Sportservice sells food and merchandise inside Busch Stadium. In 1984, an ordinance, Ord. No. 59090, was enacted in the City of St. Louis prohibiting the vending of food, merchandise or services on the streets or sidewalks immediately adjacent to Busch Stadium, except by those doing so under agreement with Civic Center.

Plaintiffs filed suit against defendants, in a three count petition, alleging that defendants violated the antitrust laws of Missouri and tortiously interfered with plaintiffs' business relations. In Count I, plaintiffs allege defendants violated § 416.031.1 RSMo 1986. More specifically, plaintiffs allege: "defendants ... entered into a contract, combination or conspiracy to restrain trade ... and to eliminate competition in the sale of ... [food and merchandise] ... in the geographic market consisting of the outside area immediately adjacent to Busch Stadium"; defendants entered into a "sham" contract with others "to conceal and attempt to legitimize their illegal actions"; "[t]he contract allows the defendants to totally control the sale of goods ... food, ... thereby eliminating ... free and open competition ..."; the defendants, acting pursuant to the contract, granted "certain individuals the exclusive right to sell in the outside area immediately adjacent to Busch Stadium at fixed or stabilized or uniform prices;" Civic Center agreed to make improvements "in the outside area immediately adjacent to Busch Stadium in exchange for the [City] passing an ordinance to eliminate ... all vendors except those controlled by Civic Center"; and the "intended effects" of these acts "have been to maintain .. Sportservice['s] market position and prevent and eliminate competition and fix prices ... in the outside area immediately adjacent to Busch Stadium, ... [and] to ... exclude ... plaintiffs, from [this] field of competition."

In Count II, plaintiffs allege that defendants violated § 416.031.2 RSMo 1986. More specifically, plaintiffs allege: defendants "entered into a ... conspiracy to monopolize or attempt to monopolize trade and commerce and to eliminate competition in the sale of goods, wares, merchandise and food in the outside area immediately adjacent to Busch Stadium"; and this monopoly power was acquired willfully, intentionally and illegally.

In Count III, plaintiffs allege: defendants "conspired and agreed to interfere with the business relations and expectancies of plaintiffs," thereby causing a termination of these business expectancies and relations.

Defendants filed separate motions to dismiss plaintiffs' petition for failure to state a claim upon which relief could be granted. These motions were granted. Plaintiffs appealed. This Court reversed the grant of the motions and remanded the case to the trial court. *DeFino v. Civic Center Corp.*, 718 S.W.2d 505 (Mo.App.1986).

Then, after extensive discovery by the parties, both defendants moved for summary judgment, contending their conduct, alleged by plaintiffs to be illegal, was protected by the *Noerr–Pennington* doctrine. These motions were granted. This appeal of plaintiffs followed.

■■■ The *Noerr–Pennington* doctrine originated in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). As part of that doctrine, concerted attempts to induce the passage or enforcement of laws are immunized from anti-trust liability, regardless of the anticompetitive purpose or effect of those laws. *Noerr*, 365 U.S. at 138–140, 81 S.Ct. at 530–531. Moreover, these concerted attempts are immunized whether standing alone or as part of an overall conspiracy which itself may be violative of the Sherman Act. *Pennington*, 381 U.S. at 670, 85 S.Ct. at 1593; Handler, *Twenty–Five Years of Antitrust*, 73 Col.L.R. 415, 430–31 (1973). This immunity derives from the premise that no Sherman Act violation occurs when the restraint of trade or monopolization is the result of valid legislative action. *Noerr*, 365 U.S. at 136, 81 S.Ct. at 529. Therefore, genuine efforts to induce valid legislative action are likewise immune from antitrust liability. *Id.* To hold otherwise would impute to Congress the intent to permit the Sherman Act to be used to limit freedom of expression and the right to petition. *Id.* at 138, 81 S.Ct. at 530.

The Court recognized the possibility that the political process may be abused in the guise of the doctrine and, thus, created what is now called the "sham exception" to that doctrine:

> There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.

*Id.* at 144, 81 S.Ct. at 533.

"[T]he sham exception applies only where the defendant is not really seeking to elicit government action at all." *Handler, supra* at 436. Conversely, "a genuine effort to influence public officials can never violate the antitrust laws, regardless of what defendant's direct or ulterior intentions may be". *Id.*

The rationale underpinning the *Noerr–Pennington* doctrine also has been applied to create immunity from common law liability, in particular, immunity from the claim of tortious interference with a business expectancy or relationship. *Sierra Club v. Butz*, 349 F.Supp. 934 (N.D.Cal. 1972); *see also, Missouri v. NOW*, 620 F.2d 1301 (8th Cir.1980) and cases cited therein.

■■■ In invoking the *Noerr–Pennington* doctrine by summary judgment, defendants necessarily raise the issue of the burden of proof now required by Rule 74.04 to support their motions. Prior to the date defendants' motions were filed, Rule 74.04(h) permitted summary judgment to be entered only when "the prevailing party is shown by unassailable proof to be entitled thereto as a matter of law." Subsection (h) has been deleted. Thus, it is no longer necessary to support a motion for summary judgment by "unassailable proof." *See, e.g. Hayes v. Hatfield*, 758 S.W.2d 470, 472 (Mo.App.1988). None of the parties has cited Missouri authority, nor has our research disclosed any, which defines either the meaning of the deletion of subsection (h) or the present burden of proof under Rule 74.04.

Rule 74.04, however, is now almost identical to Rule 56 of the Federal Rules of Civil Procedure. Since we may use federal precedent when our Rule tracks a federal rule, *In re Estate of Caldwell*, 766 S.W.2d 464, 466 (Mo.App.1989), defendants urge us to use the burden of proof for summary judgments established by the United States Supreme Court in a 1986 trilogy of cases. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Although defendants characterize these cases as "clarifying" the burden of proof needed for summary judgment, they acknowledge these cases "lessen" the burden of proof needed for summary judgment, signaling a change in policy by the Supreme Court toward a greater use of summary judgment to avoid "unnecessary" trials.

In our view, this trilogy of cases make significant changes in the moving party's burden of proof and the manner in which that burden is satisfied. Thus, under *Celotex*, the moving party has "the initial responsibility of informing the district court of the basis of its motion, and identifying those portions" of the record it believes shows a lack of genuine issue of fact. *Celotex, supra* 477 U.S. at 323, 106 S.Ct. at 2552. This initial burden may be "discharged merely by 'showing'—that is, pointing out to the district court—that there is an absence of evidence supporting the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2553. This shifts the burden of going forward to the nonmoving party, and, where the nonmoving party bears the burden of proof at trial on certain dispositive issues, that party must designate specific facts showing there is a genuine issue of fact on at least one of those issues. *Id.* at 324, 106 S.Ct. at 2553. Rule 56 "mandates the entry of summary judgment" if, "after adequate time for discovery", the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. Moreover, the pretrial record is not viewed to determine whether enough evidence exists to raise an inference to be resolved a trial, but rather whether it would allow the nonmoving party, if plaintiff, to survive a motion for directed verdict were one based on the record. *Anderson, supra* 477 U.S. at 249, 106 S.Ct. at 2510.

We see no need to adopt completely either the holdings or teachings of this trilogy in order to apply our present Rule 74.04 to the present facts.[1] None of the parties has listed or described explicitly the exact evidence that was before the trial court. *See Johnson v. Johnson*, 764 S.W.2d 711, 713 (Mo.App.1989). Therefore, we take the record filed with this court as the record before the trial court. *Id.* This record shows there is no genuine issue of material facts; therefore, the record supports the court's grant of summary judgment.

■ The inapplicability of the *Noerr–Pennington* doctrine is an essential element of plaintiff's case. *Clipper Exxpress v. Rocky Mountain Motor Tariff*, 690 F.2d 1240, 1259 (9th Cir.1982), cert. denied, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983); *see also California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642, 646 (1972). It is not an affirmative defense to be borne by defendants. *California Motor, supra*. Each defendant submitted an affidavit of one of its officers showing that the conduct, alleged by plaintiffs to be illegal, was within the *Noerr–Pennington* doctrine. Each affidavit focuses on this essential element of plaintiffs' case. Thus, Kenn Reynolds, Civic Center's President from August, 1981 to December 31, 1984 stated under oath:

During 1983 and 1984 Civic Center engaged in a lobbying campaign to have the St. Louis Board of Aldermen pass an ordinance regulating vending around Busch Stadium.... On no occasion did Civic Center discuss with Sportservice the elimination of vending outside of

---

1. Apparently, our colleagues in the Western District may have adopted part of the teaching.

*See. American Bank of Princeton v. Stiles*, 731 S.W.2d 332, 338 (Mo.App.1987).

Busch Stadium by any means other than lobbying for a city ordinance. (See Appendix A)

And, Jack Hertenstein, Director of Operations of Sportservice since August, 1984 and, immediately before that, Regional Director of Sportservice responsible for Busch Stadium, stated under oath:

> During the period between late 1983 and early 1984, Civic Center informed Sportservice of Civic Center's lobbying effort to have the St. Louis Board of Aldermen pass an ordinance regulating vending adjacent to Busch Stadium. All discussions between Civic Center and Sportservice during this period and material to this case involved the passage of an ordinance regulating vending outside Busch Stadium.

■ Plaintiffs argue these statements are merely conclusory statements and the rest of the statements in the affidavits are mere conclusions of law; and, therefore, plaintiffs argue the affidavits cannot support defendants' motions for summary judgment. We disagree.

The essential issue here is the applicability of the *Noerr–Pennington* doctrine. Defendants' affidavits state they did nothing more than lobby the Board of Aldermen to pass the ordinance in question. To us, this is a simple statement of fact. Plaintiffs argue that defendants must describe in detail their exact conduct and exact conversations related to this lobbying effort. But this requires defendants to carry an almost insurmountable burden. No matter how specific or explicit defendants' description of their conduct would be, there still could be unstated acts or conversations which show their conduct was not a genuine effort to have the ordinance passed. Defendants, in effect, would be required "to prove" a negative. To obviate this burden, we find defendants' direct statements that they never engaged in any conduct except to lobby are sufficient to move the burden of going forward to plaintiffs to show there is an issue of fact of whether defendants' conduct was genuine lobbying.

Moreover, even if these affidavits are not sufficient to shift the burden to plaintiffs,

there are additional parts of the record which cure this defect. The deposition of Kenn Reynolds was taken as well as the deposition of Jeffrey Wehling, the Vice President of Fleishman–Hillard who was responsible for the public-relations of Civic Center during the time period in question. The detailed questions and answers in these depositions show nothing more than defendants' conduct was directed solely toward the enactment of the ordinance in question.

Furthermore, the deposition of each plaintiff was taken. They both testified they knew nothing about any meetings concerning the alleged conspiracy. If these meetings were held, they did not know when or where they were held, who was present or what transpired. Thus, plaintiff John Eyre testified:

> Q. Are there other things in your head concerning the allegations [of conspiracy between Civic Center and Sportservice]
>
> . . . .
>
> A. No. This is my own gut feeling. This is something I'm hoping my lawyer can find out for me.

And, plaintiff Ronald DeFino testified:

> Q. But is the allegation [of a conspiracy] . . ., to your knowledge, anything more than your assumption.
>
> A. It is just based on my feeling. I don't know of anything positive to be done.
>
> Q. You don't know of any facts or ever seen any documents or anything about such meetings.
>
> A. No.

Plaintiffs, however, argue that their deposition testimony should not be used against them, because a protective order barred plaintiffs' attorney from discussing confidential information with them. Plaintiffs argue their attorney provided the trial court with the evidence necessary to deny defendants' motions. This evidence, plaintiffs contend, is listed in sixteen separate paragraphs, showing there are genuine issues of fact shown by the record. (See Appendix B) This list, however, when

stripped to its essentials, is at times not supported by the record or is contrary to the record, and, when consistent with the record, it does not show a genuine issue of a material fact. Whether the paragraphs are read separately or in combination, they do not raise genuine issues of material fact requiring a trial.

In paragraph 1, plaintiffs assert that Civic Center and Sportservice discussed the vending activities outside of Busch Stadium. Plaintiffs do not assert these discussions were not related to passing an ordinance. There is no evidence in the record showing these discussions were not a part of a plan to seek legislative action.

In paragraphs 2 and 3, plaintiffs assert that Sportservice had exclusive rights to vend in or at Busch Stadium and that Sportservice waived those rights to allow Civic Center to conduct activities outside of Busch Stadium. Plaintiffs rely on a "Concession Agreement" in the record to support these assertions. This Agreement, however, was signed nearly 20 years prior to the events in question. Moreover, there is nothing in the Agreement or record showing that Sportservice waived any of these rights. Furthermore, these assertions do not dispute that defendants were acting to influence legislative action.

In paragraph 4, plaintiffs assert that Civic Center had a plan to obtain control of vending at Busch Stadium, and, in paragraphs 7 and 10 through 14, plaintiffs assert that Civic Center and Sportservice agreed to work together to "run" the vending outside of Busch Stadium. We assume plaintiffs make these assertions about the "plan" and "agreement" they perceive in order to support the allegations of conspiracy in their petition. These assertions, even if supported by the record, do not dispute and are consistent with defendant's showing of a genuine intent to influence legislative action.

In paragraphs 5 and 6, plaintiffs assert that Civic Center hired a public relations firm and law firm to further its plan, and plaintiffs assert secret meetings were held with key aldermen. Again, these asser-

tions do not dispute and are consistent with defendants' showing their intent was to influence legislative action. Moreover, plaintiffs' characterization of the meetings with aldermen as "secret" is not supported by the record.

In paragraph 8, plaintiffs assert that Civic Center has monopoly power over "goods, wares and souvenirs immediately outside of and adjacent to Busch Stadium". Plaintiffs also assert that Civic Center fixes prices and that true competition has ceased to exist. These assertions are not supported by the part of the record cited by plaintiffs. The current licensed vendors deposed by plaintiffs testified they are free to set their own prices independent of Civic Center. Moreover, these assertions do not raise a fact issue about a conspiracy between Civic Center and Sportservice as alleged in plaintiffs' petition. More important, perhaps, as noted by Civic Center:

> "[Plaintiffs] are suing as competitors excluded from vending, not purchasers of souvenirs who have been overcharged as a result of alleged price fixing."

In paragraph 9, plaintiffs assert that Civic Center knew plaintiffs were vending outside of Busch Stadium. This neutral fact is not in dispute, and it raises no question about defendants' stated intent to influence legislative action.

In paragraphs 15 and 16, plaintiffs assert that Civic Center "prepared [the] testimony" made by two people before the Board of Aldermen. In their testimony, these two people, plaintiffs assert, acknowledged that Civic Center and Sportservice had an agreement "relating to outside vending at Busch Stadium." There is no showing that Civic Center and Sportservice lacked the right to agree with Sportservice that Sportservice would participate in running the vending operations outside Busch Stadium. Moreover, the record shows nothing more than this initial agreement was made as part of defendants' lobbying effort to have the ordinance passed; and, certainly, if defendants did indeed help "prepare" the testimony of these two people, the "preparation" tends to show defendants' desire to influence the Board, rather than raising a

dispute about the genuineness of defendants' intent.

Plaintiffs argue that defendants' meetings with aldermen violated the Missouri Sunshine Act, §§ 610.010—610.030, RSMo 1986. These violations, plaintiffs contend, are illegal acts which are not protected by the *Noerr–Pennington* doctrine. However, we need not decide whether a violation of the Sunshine Act is the kind of illegality that would prevent defendants from being protected by the *Noerr–Pennington* doctrine. Plaintiffs have not shown that the meetings in question were illegal.

Plaintiffs rely on *Kansas City Star Co. v. Shields*, 771 S.W.2d 101 (Mo.App.1989). In that case, a meeting of a quorum of the finance committee of the city council was held without public notice. *Id.* at 102. Only committee members plus staff personnel attended. *Id.* A document entitled "Another Budget Alternative" was presented at the meeting. *Id.* Later, a memo entitled "Another Budget Alternative" set forth a unanimous agreement of the finance committee. The memo was "virtually identical" to the document from the meeting. *Id.*

■ In the instant case, there was no quorum of any committee, persons not associated with the Board of Aldermen apparently were present and there is no evidence that any official actions were taken. From all that appears in the record, some constituents were lobbying some aldermen. The Sunshine Law was never meant to require public notice of every meeting between a constituent and aldermen.

Given the present record, the trial court properly granted defendants' motions for summary judgment. The parties had ample time to use discovery to obtain evidence to support their respective positions. We see no point in reversing and remanding this cause for further discovery.

Judgment affirmed.

SMITH, P.J., and STEPHAN, J., concur.

### APPENDIX A

### AFFIDAVIT OF SPORTSERVICE CORPORATION

Jack Edward Hertenstein, of lawful age, being duly sworn upon his oath states:

1. I am the Director of Operations of Sportservice Corporation and have been the Director of Operations since August, 1984. Immediately prior thereto, including all of 1983, I was Regional Director of Sportservice with responsibility for Busch Stadium.

2. During the period between late 1983 and early 1984, Civic Center informed Sportservice of Civic Center's lobbying effort to have the St. Louis Board of Aldermen pass an ordinance regulating vending adjacent to Busch Stadium. All discussion between Civic Center and Sportservice during this period and material to this case involved the passage of an ordinance regulating vending outside Busch Stadium.

3. Sportservice was not party to any agreement to act in concert with Civic Center to restrain trade or commerce, to eliminate competition, to fix prices, to monopolize or attempt to monopolize trade or commerce, or to interfere with the business of Messrs. Defino or Eyre in connection with the sales of goods, wares and merchandise in the outside area immediately adjacent to Busch Stadium.

/s/ Jack Edward Hertenstein

### AFFIDAVIT OF KENN A. REYNOLDS

KENN A. REYNOLDS, having been duly sworn, deposes and says:

1. I make this affidavit on personal knowledge in support of the motion of defendant Civic Center Corporation ("Civic Center") for summary judgment in the above-captioned litigation.

2. I was President of Civic Center from August 1981 to December 31, 1984. Civic Center is the sole owner of Busch Stadium in downtown St. Louis.

3. During my tenure, Civic Center was hot a party to any agreement to act in concert with Sportservice Corporation ("Sportservice") to fix or raise the prices of

souvenirs at Busch Stadium, to preserve Sportservice's market position for the sale of souvenirs at Busch Stadium, or to exclude competitors from the sale of souvenirs in the outside area immediately adjacent to Busch Stadium.

4. During 1983 and 1984 Civic Center engaged in a lobbying campaign to have the St. Louis Board of Aldermen pass an ordinance regulating vending around Busch Stadium. I was personally involved in Civic Center's lobbying effort to regulate vending outside of Busch Stadium. On no occasion did Civic Center discuss with defendant Sportservice the elimination of vending outside of Busch Stadium by any means other than lobbying for a city ordinance.

5. In March 1984 the Board of Aldermen enacted Ordinance 59090, which prohibits vending around Busch Stadium except by persons licensed by Civic Center. Civic Center proceeded to license vendors in accordance with the terms set forth in an attachment to Ordinance 59090 which was incorporated and approved by the Board of Aldermen.

6. The persons who previously had been souvenir vendors outside Busch Stadium were given first priority for licenses in 1984. Many of these former vendors applied for and received licenses from Civic Center to continue vending. No applications of former vendors were refused in 1984.

7. Sportservice was not involved in any way in determining who was to be licensed, what merchandise was to be sold by the licensed vendors, or what prices were to be charged to the public by the licensed vendors.

8. Civic Center had no knowledge that plaintiffs had any regular customers or that there were customers who sought to purchase souvenirs outside Busch Stadium from plaintiffs in particular. Civic Center's efforts to obtain an ordinance regulating vending outside Busch Stadium were not undertaken for the purpose of maliciously destroying the businesses of plaintiffs Eyre and DeFino. Had plaintiffs applied for licenses to vend in 1984, Civic Center would have approved their applications.

/s/ Kenn A. Reynolds

APPENDIX B

PLAINTIFFS' LIST OF
ISSUES OF FACT

1. Civic Center and Sportservice met frequently during the relevant time periods to discuss the vending activities outside of Busch Stadium.

2. Civic Center and Sportservice had a contract granting Sportservice the exclusive rights to vending activities in or at Busch Stadium.

3. Sportservice and Civic Center agreed to waive this exclusive provision thereby allowing Civic Center to conduct the vending operations outside of Busch Stadium.

4. Civic Center formulated a plan to obtain control of outside vending at Busch Stadium prior to February 10, 1984.

5. Civic Center in furtherance of the plan, acted with Fleischman–Hillard, Inc. to obtain control over the entire Civic Center project area in downtown St. Louis.

6. In furtherance of its plan, Civic Center hired Thompson & Mitchell, as early as 1983, to take steps in furtherance of the conspiracy, such as arranging secret meetings with key aldermen and the mayor of the City of St. Louis and to obtain confidential and private tax information from various offices of the City of St. Louis.

7. Civic Center and Sportservice initially agreed to work together to carry out the vending activities outside of Busch Stadium.

8. As a result of the contract, combination or conspiracy, Civic Center holds a monopoly position, as the only entity selling goods, wares and souvenirs, immediately outside of and adjacent to Busch Stadium. Civic Center and the vendors it hired agree upon and fix the price of goods, wares, merchandise and souvenirs to be sold

to the public at large. The prices charged to the public at the fixed prices, have increased from year to year from 1984 to 1987, thereby allowing Civic Center to earn more money at the expense of the public at large. True competition has ceased to exist in this market for all those products.

9. Civic Center was aware of the fact that both plaintiffs were engaged in the business of vending outside of Busch Stadium for a number of years prior to 1984 because Civic Center had the police department of the City of St. Louis investigate the matter for them and forward reports to Civic Center.

10. Kenn Reynolds testified before the Board of Aldermen of the City of St. Louis and represented to the board that Civic Center and Sportservice had *agreed* to work together in running the outside vending at Busch Stadium.

11. On or about February 22, 1984, Civic Center, Fleischman–Hillard and J.M. Flynn all discussed and were aware of the fact that Civic Center and Sportservice had an agreement to control outside vending at Busch Stadium.

12. On or about February 17, 1984 Civic Center, Sorkis Webbe, Jr. and Ed Ruesing, discussed and were aware of the agreement between Sportservice and Civic Center to control outside vending at Busch Stadium.

13. Sportservice acknowledged in writing, its agreement to work with Civic Center in operating the outside vending at Busch Stadium.

14. Sportservice participated with Civic Center and Fleischman–Hillard in preparing a letter to be sent to all key suppliers at Busch Stadium. In the letter, Sportservice acknowledged an agreement whereby Sportservice "would take over all outside vending responsibilities."

15. Civic Center prepared testimony which was presented to the Board of Aldermen by Dennis Bond, manager of the Marriott Hotel. In the testimony, Mr. Bond acknowledged the existence of an agreement between Sportservice and Civic Center relating to vending outside of Busch Stadium.

16. Civic Center prepared testimony which was presented to the Board of Aldermen by Larry Williams, City Treasurer of the City of St. Louis. In his testimony, Mr. Williams acknowledged the existence of an agreement between Sportservice and Civic Center relating to outside vending at Busch Stadium.