Y.G. and L.G., Plaintiffs–Appellants,

v.

The JEWISH HOSPITAL OF ST. LOUIS and Multi–Media KSDK, Inc., Defendants–Respondents.

No. 57675.

Missouri Court of Appeals,
Eastern District,
Division Four.

July 12, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 22, 1990.

Application to Transfer Denied
Oct. 16, 1990.

Frank Susman and Randall B. Kahn, Clayton, for plaintiffs-appellants.

Peter F. Spataro, Gerald R. Ortbals, and John William Moticka, St. Louis, for defendants-respondents.

JOSEPH J. SIMEONE, Senior Judge.

## I.

### Introduction

These proceedings involve the common law tort of an alleged invasion of the privacy of the plaintiffs-appellants, Y.G. and L.G., husband and wife. The trial court dismissed the petition of the plaintiffs. We reverse and remand for further proceedings.

This complex, important case of first impression requires us to decide the precise issue of resolving the delicate balance between a married couple's right to their privacy in procreating children by the process of *in vitro* fertilization and the privilege or freedom of a hospital where such procedures are done, and the freedom of the electronic news media to report and make public the events surrounding the modern medical "miracle" of the extraordinary process *in vitro* fertilization.

The issue is certainly not easily resolved for the cherished freedoms embodied in the American ideal of privacy of the individual and the freedom of the news media necessarily conflict. On the one hand, private individuals in the plight of these unnamed plaintiffs to keep their bodily procreative secrets known only to their parents or certain close friends is of the highest importance to them, and on the other hand, the news media has a privilege and often a duty to report to the public certain "newsworthy" events which are of great interest to the general public.

This case arises upon "motions to dismiss" the plaintiffs-appellants' petition and the summary dismissal thereof under Rules 55.27 and 74.04. The precise issue which must be determined, under traditional principles of these rules, is whether the appellants have stated a claim for relief and are entitled to a trial on the merits, regardless of whether they may prove their claims and obtain damages for any losses they may have sustained.

At this stage of the proceedings, we conclude that the experienced trial court's action in dismissing the petition of the plaintiffs seeking damages for the common law tort of the right of privacy was inappropriate and therefore reverse the order of the trial court and remand the cause for further proceedings.

## II.

### The Facts

On October 31, 1989, the circuit court of the City of St. Louis issued its Order dismissing plaintiffs' petition upon motion of Jewish Hospital of St. Louis and the "motion to dismiss" filed by KSDK. The Order stated that KSDK submitted exhibits and affidavits, as did the appellants, and having considered the pleadings, motions, all exhibits and affidavits, the court sustained the motions to dismiss.

The first amended petition filed on June 20, 1989, stated that Y.G. and L.G. are husband and wife and residents of St. Louis County. KSDK has its principal

place of business in the City of St. Louis, and Jewish Hospital also has its principal place of business in the city. The petition alleged that the wife, L.G., was five months pregnant, bearing triplets "conceived through a medical process known as *in vitro* fertilization at and under the auspices of [Jewish Hospital]." [1] The hospital had planned to have a "social function" and a "meeting of [the] couples" presently and previously involved in its *in vitro* program which would be held on September 11, 1988, to commemorate the fifth anniversary of the *in vitro* fertilization program at the hospital. Plaintiffs were invited to this "social gathering" and "meeting." The petition specifically alleged that the hospital "assured" them that no "publicity nor public exposure of persons attending" the function would occur. At the invitation of the Hospital, plaintiffs attended the "function." The plaintiffs alleged that at that "function" a "film and reporting news team of KSDK was present." Plaintiffs were twice requested to give an interview on television film but each time they refused, and made every "reasonable effort" to avoid being filmed or interviewed by the representatives of the electronic media.

Before the social function of *in vitro* procedure, plaintiffs had "told no one" about their attempt to procreate, other than Y.G.'s mother. The petition then alleged that "without permission", and after having been denied "express permission, waiver or privilege, KSDK filmed the function and showed it on their television program that evening ... [that] L.G. [and Y.G.] were present at [the] Hospital's function, ... and the newscast [although not mentioning their names] told [that they were] expecting triplets by reason of their participation in [the] Hospital's *in vitro* program."

The petition concluded that the "acts" of defendants constituted an invasion of plaintiffs' privacy. Plaintiffs' identification as parents of triplets conceived through the *in vitro* program was a private matter in which the public had no legitimate concern. The "acts of defendants damaged Plaintiffs by loss of their privacy, by embarrassment

---

1. Recent advances in the technology of human reproduction have made procreation a feasible alternative to "natural" procreation within marriage. One of the methods is *in vitro* (in glass) fertilization which has enabled women with blocked or damaged fallopian tubes to conceive and bear children. In such procedure mature ova are surgically removed and placed in a laboratory medium together with sperm. After fertilization and several cell divisions, the early-stage embryo is implanted in the uterus. *See* Wadlington, *Artificial Conception: The Challenge for Family Law*, 69 Va.L.Rev. 465, 468 (1983); *Newsweek*, July 2, 1984 at 54; *Comment*, 98 Harv.L.Rev. 651 (1985).

 *In vitro* fertilization first caught the public eye in 1978 with the birth of the first test tube baby, Louise Brown, born in July, 1978 in Oldham, England.

 IVF involves removing a ripe egg from a woman's body and combining that egg with sperm in a Petri dish, by a process called Laparoscopy or "aspiration." If fertilization occurs, the womb is implanted. Since 1978, more than 169 clinics exist in the United States alone. Approximately 7,000 couples enrolled in IVF clinics in 1987. The potential is estimated at one million in 1990. IVF is expensive and often unsuccessful. "IVF is complicated, time consuming, and physically taxing at virtually every step." *Developments in The Law—Medical Technology and the Law*, 103 Harv.L.Rev. 1519, 1537 (1990).

 *See* various articles dealing with test tube babies in Brown & Freeman, *Our Miracle Named Louise*, 106 McCalls 89 (1979); Barthel, *Just a Normal Naughty Three-Year Old*, 109 McCalls 78 (1982); Newell, *An Infertile Couple's Search for a Remedy*, 26 People Weekly 115 (Nov. 10, 1986); Dr. Bellina, *How to Have a Test Tube Baby*, 83 Glamour 122 (May, 1985); 123 *Time Magazine*. Jan. 23, 1984 at 30; 97 *Newsweek* 86 (June 29, 1981); *America's First Test Tube Baby*, 121, 311 Science News 7 (Jan. 2, 1982 and May 16, 1981); *The Test Tube Generation Celebrates Its First Decade*, 31 People Weekly 77 (June 5, 1989); Louise Brown, 21 People Weekly 82 (Mar. 5, 1984).

 Legal periodicals dealing with the medical, legal and ethical aspects of *in vitro* fertilization include: Eccles, *The Use of In Vitro Fertilization*, 12 Pepperdine L.Rev. 1033 (1985); *In Vitro Symposiums*, 32 Loyola L.Rev. 311, et seq. (1986); Special Project: *Legal Rights and Issues Surrounding Conception, Pregnancy and Birth*, 39 Vand.L.Rev. 597, 678 (1986); Smith and Iraola, *Sexuality, Privacy and the New Biology*, 67 Marq.L.Rev. 263 (1984); Blow, *In Vitro Fertilization: New Territory for the Preconception Tort*, 5 Geo. Mason L.Rev. 169 (1982); Dickman, *Social Values in a Brave New World*, 29 St. Louis U.L.Rev. 817 (1985). For specific medical aspects in *in vitro*, see 51 Medico–Legal J. 166 (1983).

and by ridicule … by those who viewed" the news program of KSDK, and that the "acts of defendants were such to bring humiliation or shame to a person of ordinarily sensibilities." Plaintiffs prayed for actual and punitive damages. An affidavit by Y.G. was filed with the petition. The affidavit stated that after the televised broadcast, she received numerous calls, and embarrassing questions and in addition was chastised by her church. The husband's affidavit stated he was ridiculed at work. Implicit in the petition is the fact that KSDK was informed of the September, 1988 function and was invited to attend the function.

On August 25, 1989, Jewish Hospital filed its motion to dismiss for failure to state a claim upon which relief could be granted because (a) it "did not publicize the events" mentioned in the petition, (b) the televised report was of legitimate concern to the public, (c) it "had no reason to expect that the report prepared by KSDK would be highly offensive to a reasonable person," and (d) plaintiffs waived "whatever right of privacy they had by attending the function in the company of third party non-medical personnel." KSDK also filed a motion to dismiss for failure to state a claim contending that its "report was of legitimate concern to the public," "that it had no reason to believe that the report would be highly offensive to a reasonable person," and plaintiffs waived "whatever right of privacy they had by attending the September 11, 1988 party."

Attached to the motion filed by KSDK were certain affidavits stating that the topics of infertility, and procreative technology, including *in vitro* fertilization have been regularly featured in news reports by both print and electronic media. Various news reports were attached. The executive secretary for KSDK attached a videotape copy of the video broadcast taken at the hospital on September 12, 1990. With permission, this video broadcast was shown to the court during oral argument. The reporter for KSDK also made an affidavit. In the affidavit she stated that Jewish Hospital invited KSDK to attend and report on the "party" the hospital was holding. She attended the "party" and prepared the TV report which was broadcast on the 10:00 p.m. news. The plaintiffs appeared on camera for approximately three seconds.

KSDK's brief contends that their report was a matter of legitimate concern to the public, that plaintiffs' "fleeting appearance" was not a private matter and was not a "public disclosure of private facts;" it was not highly offensive and that the plaintiffs waived whatever right of privacy they had by attending the "party."

On September 14, 1989, the court acknowledged the filing of KSDK's affidavits and brief in support of its motion to dismiss, and pursuant to Rule 55.27(a), treated KSDK's motion to dismiss as one for summary judgment. The court did not issue a similar order as to the motion to dismiss filed by Jewish Hospital although there were also affidavits filed therewith.

After the motions were argued, the trial court, on October 31, 1989 sustained the "motions to dismiss" filed by both Jewish Hospital and KSDK.

In proper time, plaintiff-appellants appealed.

### III.

#### Contentions on Appeal

On appeal, appellants contend that the trial court erred in dismissing their petition as to Jewish Hospital because it states a claim for invasion of privacy and erred in granting KSDK's motion for summary judgment because material issues of fact exist, hence KSDK is not entitled to judgment as a matter of law.

On the other hand, KSDK and Jewish Hospital contend in their briefs the same or similar points raised in their motions.

### IV.

#### Procedural Issues

We first examine the procedural issues involved.

Since a portion of this case relating to Jewish Hospital emanates upon a motion to dismiss, we must examine the petition, and

494

attachments thereto in the light of the well known principles relating to the modern motion to dismiss.

■ On a motion to dismiss for failure to state a claim, we are required to construe the petition favorably and to give the pleader the benefit of every reasonable and fair intendment and all inferences fairly deducible from the facts in view of the facts alleged, and if the pleader's allegations invoke principles of substantive law which may entitle it to relief, the petition is not to be dismissed. If the facts pleaded and the reasonable inferences to be drawn therefrom looked at most favorably from the plaintiffs' standpoint show any ground upon which relief may be granted the plaintiffs have the right to proceed. *State ex rel. Sisters of St. Mary v. Campbell*, 511 S.W.2d 141, 145 (Mo.App.1974).

■ Under modern pleading principles, a petition is not to be dismissed for failure to state a claim unless it appears that the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Laclede Gas Company v. Hampton Speedway Company*, 520 S.W.2d 625, 629–30 (Mo.App.1975); *Shapiro v. Columbia Un. Nat. Bk. & Tr. Co.*, 576 S.W.2d 310, 315 (Mo. banc 1979); *Mason v. Williams Discount Center, Inc.*, 639 S.W.2d 836, 838 (Mo.App.1982).

■ In determining therefore whether the amended petition states a claim, we must determine whether it has set forth a "short and plain statement of the facts showing that the pleader is entitled to relief. . . ." Rule 55.05. We believe that it does.

■ As to the "motion to dismiss" filed by KSDK, which was treated by the court as a motion for summary judgment, the court properly treated the motion as one for summary judgment. Rule 55.27(a); *Hurwitz v. Kohm*, 516 S.W.2d 33, 36 (Mo.App.1974); *Grus v. Patton*, 790 S.W.2d 936 (Mo.App.1990).

■ When matters outside the pleadings are presented with a motion to dismiss, the court must notify the parties that it intends to treat the motion as one for summary judgment. *Lee v. Osage Ridge Winery*, 727 S.W.2d 218, 224 (Mo.App.1987). In the instant case the Court notified the parties by memorandum that it was treating KSDK's motion to dismiss as one for summary judgment.

■ The grant of "summary judgment for a defendant is an extreme remedy because it denies a plaintiff his day in court and, hence, is proper only if the court determines from the pleadings . . . and affidavits on file that there are no material issues of fact and that the movant is entitled to a judgment as a matter of law." *Butcher v. Ramsey Corp.*, 628 S.W.2d 912, 914 (Mo. App.1982). Thus, an appellate court must consider whether there is a material issue of fact in dispute and whether the prevailing party was entitled to judgment as a matter of law. *Id.* Great caution must be exercised in granting a motion for summary judgment because it "borders on denial of due process." *Olson v. Auto Owners Ins. Co.*, 700 S.W.2d 882, 884 (Mo.App. 1985). Summary judgment may be granted only when the pleadings, depositions, admissions and affidavits on file show that there is no genuine issue as to any material fact. Rule 74.04(c). *Kilgore v. Kilgore*, 666 S.W.2d 923, 928 (Mo.App.1984); *Olson v. Auto Owners Ins. Co., supra*, 700 S.W.2d at 885. A genuine issue of fact exists where there is the slightest doubt as to the facts and summary judgment is therefore precluded so long as any facts are in doubt and are material and have legal probative force and effect as to any controlling issue. *Peer v. MFA Milling Co.*, 578 S.W.2d 291, 292 (Mo.App.1979).

■ We review the record on summary judgment in the light most favorable to the party against whom summary judgment was rendered, and will not set aside the order if it is sustainable on any theory. *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241, 242–3 (Mo. banc 1984); *Gast v. Ebert*, 739 S.W.2d 545, 546 (Mo.1987). If a genuine issue of material fact exists, summary judgment is inappropriate. An issue of

fact is material if it has "... legal probative force as to a controlling issue in the litigation," *Tatum v. General Motors Acceptance Corp.*, 732 S.W.2d 591, 592 (Mo. App.1987), and is said to exist when there is the "... slightest doubt about a fact." *Gast*, 739 S.W.2d at 546.[2] Summary judgment is appropriate only when the record discloses no theory that would permit recovery and the moving party is entitled to summary judgment as a matter of law. *Zafft*, 676 S.W.2d at 244; *Signature Pool & Court v. City of Manchester*, 743 S.W.2d 538, 540 (Mo.App.1987; Rule 74.04(c)).

After reviewing the legal file, we believe that there are genuine issues of fact to be resolved, hence we conclude the trial court erred in sustaining KSDK's motion to dismiss which was treated as one for summary judgment.

## V.

### *The Missouri Developments*

We turn to the merits of whether the amended petition filed by plaintiffs states a claim upon which relief may be granted and whether the grant of summary judgment was inappropriate.

 Although there were earlier English and American decisions obliquely construing the right of privacy by way of equitable relief,[3] it was not until the seminal, classic article of Samuel D. Warren and Louis D. Brandeis, *The Right of Privacy*, 4 Harv.L.Rev. 193 (1890),[4] that first

---

2. Since January 1, 1988 a motion for summary judgment need no longer be supported by "unassailable proof." *Hayes v. Hatfield*, 758 S.W.2d 470, 472 (Mo.App.1988). Rule 74.04 as now constructed and Federal Rule 56 are nearly identical. When a Missouri rule tracks a federal rule we may use federal precedent. *In re Estate of Caldwell*, 766 S.W.2d 464, 466 (Mo. App.1989). Recent federal precedent establishing the burden of proof for summary judgments, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), appears to *lessen* the summary judgment burden of proof. *See DeFino v. Civic Center Corp.*, 780 S.W.2d 665, 668 (Mo.App.1989).

3. *See* W. Walsh, *Equity*, Sec. 52 at 270 (1930) and H. McClintock, *Equity*, Sec. 157 at 426 (1948).

4. Warren and Brandeis complained of the activities of the news media and the need for a new tort of the right of privacy. They said in their article:

"Of the desirability—indeed of the necessity—of some such protection [to the right of privacy], there can, it is believed, be no doubt. The press is overstepping in every direction the obvious bounds of propriety and of decency. Gossip is no longer the resource of the idle and of the vicious, but has become a trade, which is pursued with industry as well as effrontery. To satisfy a prurient taste the details of sexual relations are spread broadcast in the columns of the daily papers. To occupy the indolent, column upon column is filled with idle gossip, which can only be procured by intrusion upon the domestic circle. The intensity and complexity of life, attendant upon advancing civilization, have rendered necessary some retreat from the world, and man, under the refining influence of culture, has become more sensitive to publicity, so that solitude and privacy have become more essential to the individual; but modern enterprise and invention have, through invasions upon his privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere bodily injury. Nor is the harm wrought by such invasions confined to the suffering of those who may be made the subjects of journalistic or other enterprise. In this, as in other branches of commerce, the supply creates the demand. Each crop of unseemly gossip, thus harvested, becomes the seed of more, and, in direct proportion to its circulation, results in a lowering of social standards and of morality. Even gossip apparently harmless, when widely and persistently circulated, is potent for evil. It both belittles and perverts. It belittles by inverting the relative importance of things, thus dwarfing the thoughts and aspirations of a people. When personal gossip attains the dignity of print, and crowds the space available for matters of real interest to the community, what wonder that the ignorant and thoughtless mistake its relative importance. Easy of comprehension, appealing to that weak side of human nature which is never wholly cast down by the misfortunes and frailties of our neighbors, no one can be surprised that it usurps the place of interest in brains capable of other things. Triviality destroys at once robustness of thought and delicacy of feeling. No enthusiasm can flourish, no generous impulse can survive under its blighting influence." *Id.* at 196. Although these statements were made in the days of "yellow journalism" and although there are responsible news organizations, in many respects these words still ring true for these words are still applicable to many as-

argued for, recognized and gave impetus to the modern tort of invasion of privacy.[5] *See* W. Prosser and W.P. Keeton, *Torts,* Ch. 20 at 849 (1984). The constitutional doctrines of "right of privacy" involving abortion, use of contraceptives or sexual orientation are not to be equated with the common law tort for the invasion of privacy alleged here. *See McNally v. Pulitzer Pub. Co.,* 532 F.2d 69, 76 (8th Cir.1976).

Missouri was one of the first states to give legal recognition to the "new" tort of the right of privacy. *Munden v. Harris,* 153 Mo.App. 652, 659–60, 134 S.W. 1076, 1078 (1911). In *Munden,* defendants published a photograph of a five year old boy to advertise their merchandise. The defendants demurred, and the demurrer was sustained. However, the "Kansas City Court of Appeals" refusing to follow earlier cases, in other jurisdictions, stated:

> The right of privacy is spoken of as a new right, when in fact it is an old right with a new name. Life, liberty and the pursuit of happiness are rights of all [persons] ... The right to life includes the right to enjoy life. Everyone has the privilege of following that mode of life, if it will not interfere with others, which will bring to him the most contentment and happiness. He may adopt that of privacy, or if he likes, of entire seclusion.... If this right is invaded, he

may have his remedy, either by restraint in equity or damages in an action at law. 134 S.W. at 1078.[6]

■ Since *Munden,* the Missouri Supreme Court, as well as all other states have judicially recognized the tort. *Barber v. Time, Inc.,* 348 Mo. 1199, 159 S.W.2d 291 (1942). In *Barber,* the defendant published a picture of the plaintiff and an article about a physical ailment for which she was being treated. Defendant appealed, on the ground it had a right to publish such an article under the constitutional guarantees of freedom of speech and press. Our Supreme Court noted that this new right of privacy was recognized in *Munden v. Harris,* and recognized by the American Law Institute. 4 Restatement of Torts, 398, Sec. 867 (1930). The court relied on the Warren and Brandeis article stating that "photographs and newspaper enterprises have invaded the sacred precincts of private and domestic life," and that truth is not a defense. The court noted that the basis of the right of privacy is the right to be let alone. Cooley, *Torts,* 4th ed. 444, Sec. 135. Pound, *Interests in Personality,* 28 Harv. L.Rev. 343 (1915). The right is a part of the right to liberty and the pursuit of happiness. The right is one derived from natural law and recognized by the principles of

---

pects of the news media which fail or refuse to follow the traditional and modern canons of journalism.

**5.** Since the classic article of Warren and Brandeis in 4 Harvard L.Rev., many scholarly articles have been published discussing the complexity of the common law tort: Woito and McNulty, *The Privacy Disclosure Tort,* 64 Iowa L.Rev. 185 (1979) (and articles cited therein); Zimmerman, *Requiem for a Heavyweight: A Farewell to Warren and Brandeis' Privacy Tort,* 68 Cornell L.Rev. 292, 299 (1984); Nimmer, *The Right of Publicity,* 19 Law & Contemp. Pub. 203 (1954); W. Prosser, *Privacy,* 48 Calif.L.Rev. 383 (1960); 2 F. Harper, F. James and O. Gray, *The Law of Torts,* Sec. 9.5 et seq. (2nd ed. 1986); Hill, *Defamation and Privacy and The First Amendment,* 76 Columb.L.Rev. 1204 (1976); Emerson, *The Right of Privacy and Freedom of the Press,* 14 Harv.L.R.–C.L.L.Rev. 329 (1979); Wright, *Defamation, Privacy and the Public's Right to Know,* 46 Tex.L.Rev. 630 (1968); Sanford, *Libel and Privacy, the Prevention and De-*

*fense of Litigation,* Prentice Hall Law & Business (1987); Post, *The Social Foundations of Privacy: Community and Self in the Common Law Tort,* 77 Calif.L.Rev. 957 (1989) (contending that the tort of invasion of privacy safeguards social norms and rules of "civility" and the vast contemporary expansion of the mass media endangers privacy); Wade, *Defamation and the Right of Privacy,* 15 Vand.L.Rev. 1093 (1962); Posner, *The Right of Privacy,* 12 Ga.L. Rev. 393 (1978); Zuckman, *Invasion of Privacy,* 47 Wash. and Lee L.Rev. 253 (1990). *See* collection of law journals in Prosser and Keeton, *Torts,* Sec. 117 at 850.

**6.** The court relied on *Pavesich v. New Eng. Life Ins. Co.,* 122 Ga. 190, 50 S.E. 68 (1905); *Vanderbilt v. Mitchell,* 72 N.J.Eq. 910, 67 Atl. 97 (1907); and the "very able" law journal article of Warren and Brandeis. One of the most famous, classic cases often cited is *Melvin v. Reid,* 112 Cal.App. 285, 297 P. 91 (1931)—disclosing the life of a former, reformed prostitute. The case is often referred to as "The Red Kimono Case."

the common law.[7]

## VI.

### The History and Elements of the Tort and the Merits

The history and elements of the tort are well stated by the Supreme Court *per* Judge Welliver in *Sullivan v. Pulitzer Broadcasting Co.*, 709 S.W.2d 475, 476 (Mo. banc 1986) although the precise issue in that case was whether the statute of limitations applied to a "false light case." The high Missouri court held that the tort for "invasion of privacy" originated in a 1890 law review article written by Samuel D. Warren and his law partner, Louis D. Brandeis. Warren and Brandeis, *The Right to Privacy*, 4 Harv.L.Rev., *supra. See generally* Note, *Tort Recovering for Invasion of Privacy*, 59 Neb.L.Rev. 808 (1980). In the mid 1930s, the American Law Institute acknowledged the need for such a cause of action by stating:

> A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other.

4 Restatement of Torts Sec. 867 (1939). Some of the examples offered in the comments to Sec. 867 illustrate the initial scope of this action:

> 2. A, as an advertisement for a baby food, publishes a picture of B, a mother nursing her child, without B's consent. B has a cause of action against A.
>
> 3. From a skylight in an operating room in a hospital, A takes moving pictures of an abdominal operation performed upon B, a woman. A shows these pictures publicly. B has a cause of action against A.

4 Restatement of Torts, Sec. 867, Illustrations, at 461.

Then, in 1960, Prosser suggested that the single tort for "invasion of privacy" was actually four distinct torts:

> What has emerged from the decisions is no simple matter. It is not one tort, but a complex of four. The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff, in the phrase coined by Judge Cooley, "to be let alone."
>
> Without any attempt to exact definition, these four torts may be described as follows:
>
> 1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.
> 2. Public disclosure of embarrassing private facts about the plaintiff.
> 3. Publicity which places the plaintiff in a false light in the public eye.
> 4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness. It should be obvious at once that these four types of invasion may be subject, in some respects at least, to different rules; and that when what is said as to any one of them is carried over to another, it may not be at all applicable, and confusion may follow.

Prosser, *Privacy*, 48 Calif.L.Rev., *supra* at 389.

Since the early twentieth century, Missouri has recognized a cause of action for an "invasion of privacy." *Munden v. Harris, supra,* 134 S.W. 1076. *Barber v. Time, Inc., supra,* 159 S.W.2d 291. *See also Langworthy v. Pulitzer Publishing Co.,* 368 S.W.2d 385 (Mo.1963); *Sofka v. Thal,* 662 S.W.2d 502 (Mo. banc 1983) (intrusion upon seclusion); *Zimmerman v. Associates Discount Corp.,* 444 S.W.2d 396, 398 (Mo. banc 1969) (public disclosure of private facts); *Biederman's of Springfield, Inc. v. Wright,* 322 S.W.2d 892, 895–97 (Mo.1959) (public disclosure of private facts); *Corcoran v. Southwestern Bell Tel. Co.,* 572 S.W.2d 212, 214–25 (Mo.App. 1978) (public disclosure of private facts and intrusion upon seclusion); *Williams v. KCMO Broadcasting Div.—Meredith Corp.,* 472 S.W.2d 1, 3–5 (Mo.App.1971)

---

**7.** The court relied on the famous, classic case of *Melvin v. Reid,* 297 P. 91, *supra.*

(public disclosure of private facts); *Munden v. Harris, supra* (appropriation of right of publicity).

Many decisions, since *Munden* and *Barber*, have dealt with the tort for invasion of privacy in this and other states.[8]

The elements and scope of the tort, recognized in Missouri, are embodied in the Restatement (Second) of Torts.

The Restatement (Second) of Torts (1977) recognizes the common law tort for the invasion of the right of privacy. Section 652A provides:

*General Principle*

(1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.

(2) The right of privacy is invaded by
(a) unreasonable intrusion upon the seclusion of another, as stated in Sec. 652B; or

(b) appropriation of the other's name or likeness, as stated in Sec. 652C; or

(c) unreasonable publicity given to the other's private life, as stated in Sec. 652D; or

(d) publicity that unreasonably places the other in a false light before the public, as stated in Section 652E.

■ Section 652D of the Restatement (Second) of Torts provides:

*Publicity Given to Private Life*

One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that

(a) would be highly offensive to a reasonable person, and

(b) is not of legitimate concern to the public.

■ Comment b of Sec. 652D of the Restatement states that every individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself, or at most reveals only to his family or to close personal friends. "Sexual relations, for example, are normally entirely private matters." Matters of public concern are, of course, legitimately publicized. *Cox Broadcasting Co. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). But the extent of the authority to make public private facts is not unlimited. "There may be some intimate details of life, such as sexual relations," which a person desires to keep to himself. Section 652D, comment h. An illustration given is that of a woman who gave birth to a child with two heads. A photograph of the child without permission which is publicized is an invasion of privacy.

■ The elements of an action for publication of a private matter are (1) publication or "publicity," (2) absent any waiver or privilege, (3) of private matters in which the public has no legitimate concern, (4) so as to bring shame or humiliation to a per-

---

**8.** *See* 62A, Am.Jur.2d, *Privacy* (1990) and cases collected in annot., *Invasion of Privacy by Radio, Television,* 56 A.L.R.3d 386 (1974) and Supp. See the recent case in the Supreme Court of the United States—*The Florida Star v. BJF,* ⎯ U.S. ⎯, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (publishing information of rape victim lawfully obtained is not automatically protected). *Biederman's of Springfield, Inc. v. Wright, supra,* 322 S.W.2d 892 (calling plaintiffs deadbeats); *Mason v. Williams Discount Center, Inc.,* 639 S.W.2d 836 (Mo.App.1982) (listing name of customer on list of names posted under heading "no checks" violated privacy—also listing elements); *Langworthy v. Pulitzer Publishing Company, supra,* 368 S.W.2d 385; *Williams v. KCMO Broadcasting Div. v. Meredith Corp., supra,* 472 S.W.2d 1 (TV showed plaintiff with hands up after arrest and being placed in police vehicle, no invasion of privacy); *Claspill v. Craig,* 586 S.W.2d 458 (Mo.App.1979) (union publication indicating that certain personnel were not members of local union not invasion of privacy); *McNally v. Pulitzer Pub. Co., supra,* 532 F.2d 69; *Corcoran v. Southwestern Bell Tel. Co., supra,* 572 S.W.2d 212 (no publication); *Brown v. Mullarkey,* 632 S.W.2d 507 (Mo.App. 1982) (personnel file); *Sofka v. Thal, supra,* 662 S.W.2d 502 (polite telephone calls made by collection agency, no invasion of privacy); *Buller v. Pulitzer Pub. Co.,* 684 S.W.2d 473 (Mo.App. 1984) (public disclosure of private facts); *Hester v. Barnett,* 723 S.W.2d 544 (Mo.App.1987) (Minister making public private matters); Note, *Privacy and the Press, A Necessary Tension,* 18 Loyola of La.L.Rev. 949 (1985); Glasser, *Resolving the Press Privacy Conflict,* 4 Communications and the Law, 23 (1982).

son of ordinary sensibilities.[9] *See Mason v. Williams Discount Center, Inc., supra,* 639 S.W.2d at 838; *Buller v. Pulitzer Pub. Co.,* 684 S.W.2d 473, 482 (Mo.App.1984); *McNally v. Pulitzer Publishing Co., supra,* 532 F.2d at 78; *cert. denied* 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976); Restatement (Second) of Torts, Sec. 625D (1977); *Brown v. Mullarkey, supra,* 632 S.W.2d at 509; *Hester v. Barnett,* 723 S.W.2d 544 (Mo.App.1987)—existence of secret and private subject matter, right of plaintiff to keep subject matter private, and obtaining information.

In *Buller v. Pulitzer Pub. Co., supra,* 684 S.W.2d at 480–81, this court per Judge Kelly discussed the elements of the tort and recognized that the Restatement distinctions have been adopted in Missouri, by use, if not by express language. In *Buller,* we relied on *Barber v. Time, Inc., supra,* 159 S.W.2d 291, and said if a court decides that the matter is outside the scope of proper public interest and that there is substantial evidence tending to show a serious, unreasonable, unwarranted and offensive interference with another's private affairs, then the case is one for the jury. *Buller, supra,* 684 S.W.2d at 481.

The *Buller* court recognized that Missouri courts have had numerous occasions to determine what matters are within the public interest.

In *Williams v. KCMO Broadcasting Division–Meridith Corporation, supra,* 472 S.W.2d 1, the court held that where the plaintiff was arrested by mistake and the arrest was televised, the plaintiff was involved in a noteworthy event about which the public had a right to be informed. The *Williams* court, at p. 5, distinguished this type of situation from one in which a woman's dress was blown up over her waist in public and she had been photographed, and another in which a man's injuries sustained on the job had been photographed by his employer and shown at safety meetings. Neither of these were held to be items of legitimate public interest and therefore created a cause of action for the invasion of right of privacy. In *Barber, supra,* the fact that plaintiff had entered a hospital for treatment of an eating disorder was held to be a private interest.

██ From these and other decisions, we believe it is clear that where the operation of laws and the activities of the police or other public bodies are involved, the matter is within the public interest. Where, however, events occur which affect the individual alone, and do not touch the sphere of public concern, they are not within the public interest.

██ The tort of invasion of privacy by public disclosure of a private matter requires that the fact disclosed must be a "private matter" in which the public has no legitimate concern. The determination of this fact is a matter for the court to decide and once the court has determined the matter is private, and there is substantial evidence of unreasonable interference with the private matter, the case is for the jury. *Barber v. Time, Inc., supra,* 159 S.W.2d at 295.

██ This element is often described as "newsworthiness," *see Virgil v. Time, Inc.,* 527 F.2d 1122, 1128–29 (9th Cir.1975), although it encompasses more than that. *See* 69 A.L.R. 4th 1059 (1984) for a discussion of invasion of privacy by a news-gathering entity and 56 A.L.R. 3rd 386 (1974) for a particular discussion of the radio and television media. Judicial decisions have held that certain details of a person's life may fall into the public interest through legal action, police activity or the action of other public bodies. *Buller v. Pulitzer Publishing Co., supra,* 684 S.W.2d at 482. For example, matters become the subject of legitimate public concern when they are included in open court records. *Cox Broadcasting Corp. v. Cohn, supra,* 95 S.Ct. 1029, 1046–47; *McNally v. Pulitzer*

9. The elements have been stated in various ways: (1) The private facts must be a "public" disclosure; (2) the facts disclosed must be of "private" facts; (3) the matter made public must be one which would be offensive to a reasonable person [*compare Sidis v. F–R Publishing Corporation,* 113 F.2d 806 (2nd Cir.1940), *affirming* 34 F.Supp. 19 (S.D.N.Y.1938) with *Melvin v. Reid, supra,* 297 Pac. 91]. *See* Prosser, *Privacy,* 48 Calif.L.Rev. 383, 392 (1960) *supra.*

*Publishing Co., supra,* 532 F.2d 69, or are the focus of police arrest, even if no charges follow, *Williams v. KCMO Broadcasting,* 472 S.W.2d 1, or when they involve criminal action of which the police should be informed, *Langworthy v. Pulitzer Publishing Co.,* 368 S.W.2d 385. Similarly, dissemination of an event that occurred in public view is not a private matter. *Gill v. Hearst Publishing Co.,* 40 Cal.2d 224, 253 P.2d 441 (1953); *Mark v. Seattle Times,* 635 P.2d 1081 (Wash.1981), *cert. den.,* 457 U.S. 1124, 102 S.Ct. 2942, 73 L.Ed.2d 1339. Generally stated, there can be no invasion of privacy in giving further publicity to a matter which is already public. *Virgil v. Time, Inc.,* 527 F.2d 1122, 1126 (9th Cir. 1975).

But where a peculiarly private matter is concerned, the situation is entirely different. In analogous decisions, the right of privacy has been held to apply particularly to sexual matters or matters of procreation. *See generally,* 62 Am.Jur.2d, *Privacy,* Sec. 155 at 764 (1990). Publication of sexual matters have been held actionable under the invasion of privacy tort, *Cummings v. Walsh Const. Co.,* 561 F.Supp. 872 (1983) (sexual relationship with supervisor); *Diaz v. Oakland Tribune, Inc.,* 139 Cal.App.3d 118, 188 Cal.Rptr. 762 (1983) (fact that 36 year old college student had undergone sex change operation three years earlier); *National Bonding Agency v. Demeson,* 648 S.W.2d 748 (Tex.App. 5 Dist.1983).

The Missouri Supreme Court held that a person's medical treatment is a private matter in *Barber v. Time, Inc.,* 159 S.W.2d 291 (Mo.1942). In *Barber,* the court said in determining whether the case presented a jury issue, the court stated "certainly if there is any right of privacy at all, it should include the right to obtain medical treatment at home or in a hospital for an individual personal condition (at least if it is not contagious or dangerous to others) without personal publicity." *Id.* at 295. The court held that although plaintiff's medical condition may have been a matter of public interest because it was unusual, her identity was a private matter protected by the right of privacy.

This distinction between a "newsworthy event" and publication of a purely private matter is applicable to the case at bar. The *in vitro* program and its success may well have been matters of public interest, but the identity of the plaintiffs participating in the program was, we conclude, a private matter. It did concern matters of procreation and sexual relations as well as medical treatment—all private matters. The *in vitro* fertilization program participation was certainly not a matter of public record nor did it become of public concern due to any of the ordinary incidents of public concern. Consequently, we hold that plaintiffs' identity was a private matter which was not newsworthy nor a matter of public record.

## VII.

### Other States

Decisions from other jurisdictions indicate that there are certain private matters which are not of legitimate public concern. *Vassiliades v. Garfinckel's Brooks Bros.,* 492 A.2d 580 (D.C.App.1985) (physician and department store televised pictures of plaintiff before and after plastic surgery); *Diaz v. Oakland Tribune, Inc., supra,* 188 Cal.Rptr. 762 (fact that plaintiff was transsexual is not a matter of public interest); *Banks v. King Features Syndicate,* 30 F.Supp. 352 (S.D.N.Y.1939) (publication of plaintiff's pelvic region not newsworthy); *Huskey v. National Broadcasting Co., Inc.,* 632 F.Supp. 1282 (N.D.Ill.1986) (televising picture of prison inmate in exercise cage in shorts invasion of privacy and no waiver); *National Bonding Agency v. Demeson,* 648 S.W.2d 748 (Tex.App. 5th Dist.1983) (publication of "wanted" poster invasion of privacy under Texas law); *McSurley v. McClellan,* 753 F.2d 88 (D.C. Cir.1985) (love letters); *Mason v. Williams Discount Center, Inc., supra,* 639 S.W.2d 836 (posting of list of names under heading "no checks" stated claim); *Howard v. Des Moines Register & Tribune Co.,* 283 N.W.2d 289 (Iowa 1979) (involuntary sterilization where matter of public record not actionable); *Hyde v. City of Columbia,* 637

S.W.2d 251 (Mo.App.1982) (publication of name of rape victim not a public record).

An analogous case is *Hawkins by Hawkins v. Multimedia, Inc.*, 288 S.C. 569, 344 S.E.2d 145 (1986). In *Hawkins*, the Supreme Court of South Carolina held that in publishing a story about teenage pregnancies, it identified Craig Hawkins as the teenage father of an illegitimate child. The majority of the news story focused on the unmarried teenage mother. A reporter called Hawkins who was reluctant to answer questions, and the reporter published the fact without permission. The Court upheld a judgment for plaintiff for invasion of privacy, stating that public or general interest does not mean curiosity, and newsworthiness is not the test. The court also held that whether a fact is a matter of public interest is a question of fact for the jury.

In *Feeney v. Young*, 191 A.D. 501, 181 N.Y.S. 481 (First Dept.1920), it was implied that plaintiff's taking pictures of "Caesarian Section" birth was a violation of the right of privacy. Even before the Warren and Brandeis article, a Michigan court recognized the right when a man intruded on a young woman giving birth. *DeMay v. Roberts*, 46 Mich. 160, 9 N.W. 146 (1881), cited in Prosser, *Privacy*, 48 Calif.L.Rev. *supra* at 389.

The first Restatement also gave as an example of a violation of privacy that a photographer who takes pictures of an operation performed upon a woman, is a violation of an individual's rights.

## VIII.

### *The Merits*

■ Tested within all these principles, authorities, decisions and the policies of the right of privacy and balancing the interests of the media to publish "newsworthy" events, and after the most careful consideration of the facts of this case, we conclude that plaintiffs' interests outweigh the interests of the defendants and plaintiffs should be given an opportunity to prove their case in a trial, and that all the elements necessary to maintain an action for invasion of privacy listed in the Restatement and the Missouri cases are satisfied, at least at this stage of the proceedings. Plaintiffs' participation in the program was a private matter. There was a "publication" or "publicity" of private facts; there was no waiver as a matter of law on the part of the plaintiffs; the petition alleges that the plaintiffs suffered humiliation and embarrassment and the issue of whether the matter was one in which the public has no legitimate concern as to these particular plaintiffs should be determined under a procedure other than a motion to dismiss or summary judgment.

The plaintiffs alleged in their petition that they were "assured" that "no publicity nor public exposure" would occur, that they twice refused interviews or to be filmed, and made every reasonable effort to avoid being filmed, and that no one knew of their reproductive process other than Y.G.'s mother. They stated that the function dealing with the *in vitro* function was a "private" affair in which the public had no legitimate interest. Viewing the petition in the most favorable light, we hold that it states a claim upon which relief may be granted. Implicit in the petition is an allegation that Jewish Hospital either invited KSDK to be present or informed the media that the event was to take place in September, 1988. Moreover, the KSDK reporter's affidavit explicitly stated that KSDK was "invited" by Jewish Hospital to attend and report on a party the hospital was holding on September 11, 1988.

While the modern medical, technical process of *in vitro* fertilization may be of great interest to the public generally, publicizing the individual persons who undergo such medical "miracle," without their consent and without waiver states a claim upon which relief may be granted. We adhere to the modern principles of pleading, recognized in both the federal and Missouri courts that a petition should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), discussed in 5 C. Wright & A. Mil-

ler, *Federal Practice and Procedure*, Sec. 1216 at 119 (1969).

▓ The defendants contend that the plaintiffs waived any right to privacy they had by attending the function. As to waiver by attending the function, we hold that there was no waiver. Plaintiffs were assured that the function would be private, they twice refused an interview, and by merely attending the function there was no express voluntary waiver of a known right.

▓ KSDK's motion alleged that appellants waived their right to privacy by attending the party because they disclosed their *in vitro* program participation to the other attendees. Respondent cites *Gill v. Hearst Publishing Co.*, 253 P.2d 441 (Cal. 1953), for the proposition that a person photographed while open to public view has no privacy cause of action upon publication of that photograph. The *Gill* court stated that the photograph of an amorous couple in a public park did not disclose anything which until then had been private but rather only extended knowledge of the particular incident to a somewhat larger public than had actually witnessed it at the time of occurrence. There are numerous cases holding that matters of public record or events taking place in a public location may be publicized without invasion of privacy. *Machleder v. Diaz*, 801 F.2d 46, 59 (2nd Cir.1986) (business man filmed outside his office building, on privately owned property, but no signs asking public to keep out); *Intern. Union v. Garner*, 601 F.Supp. 187 (M.D.Tenn.1985) (no invasion of privacy right where police merely observed persons arriving at union meeting and reported identities to employer); *Jackson v. Playbody Enterprises, Inc.*, 574 F.Supp. 10, 13–14 (S.D.Ohio 1983) (plaintiff photographed on public street); *Neff v. Time, Inc.*, 406 F.Supp. 858, 861 (W.D.Pa.1976) (plaintiff photographed at football game); *Jaubert v. Crowley Post–Signed, Inc.*, 375 So.2d 1386, 1387 (La.1979) (plaintiff photographed at residence from middle of street); *Cefalu v. Globe Newspaper Co.*, 8 Mass.App. 71, 391 N.E.2d 935, 939 (1979).

▓ The mere fact that an event takes place where others are present does not waive the right to privacy, *Huskey v. National Broadcasting Co., Inc., supra,* 632 F.Supp. at 1287–88. *Stessman v. A.M. Black Hawk Broadcasting,* 416 N.W.2d 685 (Iowa 1987) (dismissal of privacy action improper where plaintiff filmed in public restaurant may have been in private dining area). Similarly, disclosing private facts to an individual, even a member of the press, is not "consent" to publication since a "selective disclosure" is "based on a judgment as to whether knowledge by that person would be felt to be objectionable." *Virgil v. Time, Inc.,* 527 F.2d 1122, 1127 (9th Cir.1975). *See Hawkins by Hawkins v. Multimedia, Inc.,* 344 S.E.2d 145 (S.C.1986) (no consent to publication where plaintiff did not terminate conversation with reporter immediately, but talked for only a few minutes and was never told he would be identified in an article).

The difference between those situations where privacy is waived and those where it is preserved, at least in the news media context, may best be summed by Judge O'Neill's comment in *Rafferty v. Hartford Courant Co.,* 36 Conn.Supp. 239, 416 A.2d 1215, 1217 (1980):

> A newspaper can, at best, claim only to be one of the public. It has the same 'right to find out' as the rest of the public. It has the same right to publish as the rest of the public. It has no greater right to intrude to obtain information than each citizen has because each citizen has the same right to publish.

*See* 57 A.L.R. 3rd 16 (1974) for a discussion of waiver and loss of the privacy right.

In the case at bar, the allegations of the petition show that appellants were assured that the persons invited would include only other persons involved in the IVF program, and would not be open to the public or the media. By attending such a function, appellants clearly chose to disclose their participation to only the other *in vitro* couples. By so attending this limited gathering, they did not waive their right to keep their condition and the process of *in vitro* private, in respect to the general public.

■ Respondents contend that the appellants appeared in the news report only for a few fleeting seconds. But it is not the time that is relevant, but the fact that they did appear on the news report and were recognized by friends and acquaintances.

■ In addition, we cannot hold that attendance at the gathering constituted an appearance in a public place so as to subject appellants to publicity. *Cf. Stessman v. A.M. Black Hawk Broadcasting*, 416 N.W.2d 685 (Iowa 1987).

■ Defendants contend that the television report would not and did not bring shame or humiliation to an ordinary person. We believe this to be a factual question which the jury should resolve, and which is not appropriate to determine upon a motion to dismiss or upon summary judgment. *See Uhl v. Columbia Broadcasting Systems, Inc.*, 476 F.Supp. 1134, 1139 (W.D. Penn.1979), holding that whether a news report convening the fake impression that plaintiff shot geese on the ground would be offensive to a reasonable person was a question for the jury; *Benally v. Hundred Arrows Press, Inc.*, 614 F.Supp. 969 (D.N. M.1985); and *Meetze v. Associated Press*, 230 S.C. 330, 95 S.E.2d 606, 610 (1956).

Respondents, citing *Benally*, place great emphasis on the fact that a large part of appellants' distress stemmed from their religious affiliations and argue that appellants are extra-sensitive. It is not clear whether a reasonable person would be insensitive by disclosure of his participation in the program. The implications of this participation, and the physical problems which exist with the couple's reproductive systems or that they are incapable of performing sexually, are matters that could embarrass a reasonable person, and such matters should be left for a factual determination.

### IX.

#### Conclusion

Having read the entire legal file and having considered the complexities of this unique case, we conclude that, pursuant to the principles of the law of the tort for invasion of privacy, the trial court erred in sustaining the motion to dismiss filed by Jewish Hospital and in sustaining the motion for a summary judgment filed by KSDK. The petition, given its most liberal intendment, and construing the express allegations and all reasonable inferences contained therein, stated a claim for relief and the issues of newsworthiness, and whether the television report relating to *in vitro* fertilization in general, and showing the appellants in particular offends the common decency of a reasonable person are questions to be ultimately determined by the jury.

We, therefore, reverse the order of the trial court entered on October 31, 1988 and remand the cause for further proceedings.

Judgment reversed and remanded.

STEPHAN, J., concurs.

CARL R. GAERTNER, P.J., dissents in separate opinion.

CARL R. GAERTNER, Presiding Judge, dissenting.

I respectfully dissent.

The procedural and substantive principles so thoroughly explicated in the majority opinion do not exist in a vacuum. Their viability depends upon a realistic application to concrete facts. In my opinion the facts in this case, viewed in the light most favorable to plaintiffs, do not give rise to a cause of action for invasion of privacy.

At the outset I believe it is important to recognize we are concerned with publication of a newsworthy event, a gathering to celebrate five years of successful participation in a "miracle" of modern medical science. There is no contention the publication was inaccurate, defamatory, sensational or lacking in good taste. Plaintiffs were not identified by name nor singled out for special treatment such as a lingering close-up or an isolated picture of them apart from the large group of attendees. Their complaint is predicated solely upon their subjective desire to conceal their partic-

ipation in an undeniably newsworthy program.

The exhaustive discussion in the majority opinion of the history and development of the tort of invasion of privacy demonstrates that liability for publication of private matters is dependent not upon the subjective view of the individual, but rather upon the more objective standard of reasonableness. This objective standard, in my opinion, encompasses each of the elements under consideration: the reasonableness of plaintiffs' expectation of privacy, the reasonableness of defendants' awareness that publication would be highly offensive, the reasonableness of defendants' belief the matter is of legitimate concern to the public. Is it reasonable for plaintiffs to volunteer for participation in the *in vitro* Fertilization Project, a matter of widespread, international publicity, without recognition of the likelihood of disclosure? Is it reasonable for plaintiffs to accept the invitation to attend the five-year celebration of the program without awareness that their participation would be made known to all those in attendance as well as all who observe them entering and leaving the gathering? Is it reasonable for plaintiffs to maintain an expectation of privacy when, after seeing the cameras and refusing to be interviewed, they remain in the midst of the group of approximately forty people who were all being filmed without objection rather than stepping to the side of the room until the camera was lowered? In my opinion, each question, viewed individually and certainly when considered collectively, requires a negative answer. I do not believe reasonable minds could avoid concluding that by their conduct plaintiffs waived any right of privacy they may have subjectively desired.

Reasonableness is also the hallmark by which the conduct of defendants must be tested. Plaintiffs do not suggest any impropriety in the publicity given to the celebration of the achievements of five years of successful *in vitro* Fertilization. Assuming the truth of plaintiffs' allegations regarding their refusal to be interviewed, can defendants be charged with the realization that filming plaintiffs in the midst of the entire group of celebrants would constitute a publication causing humiliation to a person of reasonable sensibilities. *See Buller v. Pulitzer Publishing Company,* 684 S.W.2d 473, 482 (Mo.App.1984). Having scrupulously observed plaintiffs' request not to be interviewed, does the showing of plaintiffs' faces for three seconds in the midst of a group at a newsworthy affair without identification, close-up or other singling out "show a serious, unreasonable, unwarranted and offensive interference with the individual's private affairs?" *Id.* I think not. "The law does not protect the overly sensitive, and if a reasonable person would not be humiliated by the publicity, no recovery can be had." *Williams v. KCMO Broadcasting Division—Meredith Corp.,* 472 S.W.2d 1, 3 (Mo.App.1971).

Finally, the question of legitimate public interest must be viewed through the eyes of a reasonable person. The multitude of cases cited in the majority opinion clearly demonstrates that an individual's desire of privacy may be frustrated merely because of his innocent, unintentional involvement in a newsworthy event of legitimate public interest. It seems to me the attempt by the majority to distinguish between the appropriate public interest in the subject of *in vitro* Fertilization and the illegitimate public interest in plaintiffs' participation therein is vitiated by these authorities. This is particularly true in light of the truly remarkable fact that not one but three fertilized ova were implanted. I do not believe reasonable minds could differ upon the newsworthiness or legitimate public interest in plaintiffs' involvement in such a scientific accomplishment.

I would affirm the judgment of the trial court.