Raymond VEILLEUX, et al., Plaintiffs,

v.

NATIONAL BROADCASTING COMPANY, INC., et al., Defendants.

No. Civ. 97–CV–9–B.

United States District Court, D. Maine.

May 29, 1998.

William D. Robitzek, Berman & Simmons, P.A., Lewiston, ME, for Plaintiffs.

Susan E. Weiner, National Broadcasting Co. Inc., New York City, Bernard J. Kubetz, Eaton, Peabody, Bradford & Veague, Bangor, ME, for Defendants.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiffs, Raymond Veilleux, Kathy Veilleux, and Peter Kennedy bring this diversity action against Defendants, National Broadcasting Company, Inc. ("NBC"), Alan Handel, and Fred Francis, alleging negligent misrepresentation (Count I), fraudulent misrepresentation (Count II), defamation (Count III), invasion of privacy (Counts IV and V), negligent and intentional infliction of emotional distress (Counts VI and VII), loss of consortium (Count VIII), and punitive damages (Count IX). These claims arise from Defendants' broadcast of a two-part television news program on the trucking industry in 1995. Defendants have filed a Motion for Summary Judgment on all counts of Plaintiffs' Amended Complaint. For the reasons stated below, Defendants' motion is GRANTED in part and DENIED in part.

## I. SUMMARY JUDGMENT

Summary judgment is appropriate in the absence of a genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine for these purposes if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir. 1993). For the purposes of summary judgment the Court views the record in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995).

## II. BACKGROUND

The following are the facts viewed in a light most favorable to Plaintiffs. On April 19 and 26, 1995, Dateline NBC ("Dateline"), an hour-long news magazine program produced by NBC News, broadcast two reports concerning the long-distance trucking industry entitled "Keep on Truckin" ' and "On the Road Again" (hereinafter collectively referred to as the "program" or the "report"). The program focused on the pressures confronting long-haul truckers, the causes and consequences of driver fatigue, and violations of federal "hours of service" regulations that govern the industry. The program prominently featured Plaintiff Peter Kennedy, a long-distance truck driver who, with his employer Plaintiff Raymond Veilleux, agreed to allow a Dateline crew to accompany and film Kennedy on a coast-to-coast run from California to Maine in September and October, 1994.

The idea for the Dateline program arose out of a tragic highway accident that occurred in Maine in October, 1993, in which four teenagers were killed when their car was struck by a truck driven by Robert Hornbarger, who later pleaded guilty to falsifying his log entries of driving hours. Defendant Alan Handel, a freelance producer, learned of the Hornbarger accident and of the related issue of long-distance trucker fatigue and called Susan Farkas, a senior producer for Dateline, to suggest a possible story on the issue. Dateline liked the idea, commissioned Handel to produce the piece, and assigned a Dateline associate producer, Tracey Vail, to assist Handel. The project was underway in August, 1994, when a Dateline film crew traveled to Maine to film truck inspections, shoot stills of the Izer family (one of the families of the teenagers killed in the Hornbarger accident), and cover the sentencing of Hornbarger.

In the course of developing the piece, Dateline sought a long-distance truck driver who would allow a Dateline crew to accompany him or her on a coast-to-coast run. The evidence suggests that Dateline had difficulty finding a driver who would cooperate. On September 20, 1994, Vail contacted Kennedy. Kennedy had been recommended as a trucker with a good record and reputation who might be willing to participate in a story that would improve the reputation of the industry. In an attempt to induce his cooperation, Vail described the program as one which would display the "positive side" of the trucking industry, despite the fact that Vail had previously pitched a similar story to Dateline which focused on the threats posed by long-distance truckers. In that conversation Kennedy expressed his desire to focus public attention on the problems caused for truckers by inflexible hours-of-service log-keeping requirements imposed by federal law. Kennedy inquired whether the proposed program would include Parents Against Tired Truckers ("PATT"), a parent advocacy group pushing for stronger trucking regulations, and Vail responded that it would not. Kennedy informed Vail that he might be interested, but that Dateline should talk with Veilleux before going any further. Kennedy then contacted Veilleux to tell him about the story. Kennedy told Veilleux that he was interested but that he had reservations about whether the program would in fact be a positive one as promised.

Soon thereafter, Handel contacted Kennedy and explained that Dateline wanted to display a positive image of the trucking industry to counter negative publicity generated by the Hornbarger accident and the activity of PATT. Handel explained that Kennedy would be doing a good thing for the industry by participating. Kennedy stated that he would not participate if PATT was going to be involved and Handel responded that PATT would have nothing to do with the program. Handel then contacted Veilleux to make similar assurances regarding the tone

and content of the program. In subsequent conversations NBC agreed to several "ground rules" including the following: the program would depict the positive side of trucking, Kennedy would not run an illegal trip for the sake of the show, and PATT would have nothing to do with the program. NBC also agreed that Kennedy would not be asked to deviate from his typical driving routine. At one point Handel told Veilleux that Dateline wanted to show Kennedy falsifying his logbook and evading inspection stations, but Veilleux insisted that he would not agree to engage in such conduct for the sake of the program and threatened to terminate the discussions. Handel withdrew his request and agreed to do the program according to Veilleux's wishes.

After much cajoling by NBC, Kennedy and Veilleux agreed to participate. In late September, 1994, Kennedy met the NBC crew in Salinas, California, where he was scheduled to make pick-ups of produce for delivery to Chelsea, Massachusetts, on or about October 6, 1994. The NBC crew, including Dateline correspondent Fred Francis, accompanied Kennedy, in separate vehicles and in the cab, filming and interviewing him en route.

Although the Court need not recount the resulting program in depth, suffice it to say it did not portray a "positive" image of the trucking industry. The program, which concluded that "American highways are a trucker's killing field," included interviews with PATT representatives, and alleged that Kennedy repeatedly violated hours-of-service regulations, falsified his logbooks, and lied to federal inspectors. In addition, the program revealed that Kennedy had tested positive for marijuana and amphetamines in a random drug test. Stone Phillips, a Dateline anchor, accurately introduced the program by telling viewers "what you're about to hear won't make you feel any safer."

## III. DISCUSSION

### A. Misrepresentation Claims

In Counts I and II Plaintiffs allege that Defendants made false representations in order to induce Plaintiffs to participate in the Dateline program and that Plaintiffs relied on these false representations to their detriment. Plaintiffs allege negligent misrepresentation in Count I and fraudulent misrepresentation in Count II.

In defining the elements of negligent misrepresentation, the Maine Supreme Judicial Court has determined that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary losses caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating information.

*Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990) (quoting Restatement (Second) of Torts § 552(1) (1977)).

A claim of fraudulent misrepresentation arises where one:

> (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff.

*McCarthy v. U.S.I. Corp.*, 678 A.2d 48, 53 (Me.1996).

In their Motion for Summary Judgment, Defendants first suggest that the duty of care imposed by *Chapman* and Restatement section 552(1) for negligent misrepresentation is limited to "buyers" and "sellers" and that they, therefore, were under no obligation to exercise reasonable care in communicating information. The scope of a negligent misrepresentation action is not so limited. *See, e.g., Gayer v. Bath Iron Works Corp.*, 687 A.2d 617, 621 (Me.1996) (action available to employees); *Devine v. Roche Biomedical Laboratories, Inc.*, 637 A.2d 441, 445 (Me.1994) (action available to parties to service contract). The duty of reasonable care in communicating information is imposed, not simply on "buyers" and "sellers," but on anyone "who, in the course of his

business" supplies "false information for the guidance of others in their business transactions." *Chapman*, 568 A.2d at 830.

Defendants contend that if they are subject to a duty of reasonable care in conveying information to potential interview subjects the Court will in essence hold "that media representatives engaged in investigative reporting have a duty strictly to adhere to representations allegedly made to potential subjects, prior to interviewing them, regarding the anticipated tone and content of their eventual reports." Application of the *Chapman* duty of care here does not force media representatives to strictly adhere to representations made regarding the content of their reports. It simply subjects media representatives to liability for pecuniary harm where they *fail to use reasonable care* in conveying information for the guidance of others in their business transactions and where one justifiably relies on the negligently conveyed information. Plaintiffs have offered sufficient evidence at this stage of the proceedings that the promises allegedly made by NBC served to guide Plaintiffs in their "business transactions."

█ Defendants' second argument is that any reliance Plaintiffs may have placed on their promises was unjustified in light of the context in which the promises were made and the questions subsequently posed to Kennedy and Veilleux. Specifically, Defendants allege that Plaintiffs knew of Dateline's interest in hours-of-service violations, falsified logbooks, and other "negative" aspects of the trucking industry and willingly answered questions on these subjects. Therefore, Defendants contend, any continued reliance on Dateline's promises was unjustified.

█ Plaintiffs have raised a sufficient issue of material fact regarding whether their reliance was justified to survive summary judgment. Plaintiffs did not rely on "vague exhortation[s]" that amounted to "puffery," *Jordan–Milton Machinery, Inc. v. F/V Teresa Marie, II*, 978 F.2d 32, 37 (1st Cir.1992), but rather the explicit and repeated promises of NBC representatives that the story would be a positive one and would not involve PATT. No one at NBC ever recanted those promises. The fact that Plaintiffs responded

to some questions regarding negative aspects of the trucking industry does not, as a matter of law, render their continued reliance unreasonable.

█ Defendants also argue that neither Veilleux nor Kennedy can demonstrate that he suffered pecuniary harm as a result of Dateline's failure to depict the positive side of the trucking industry as promised. Pecuniary loss is an essential element of proof in both negligent and fraudulent misrepresentation claims. *Chapman*, 568 A.2d at 830 (negligent misrepresentation); *Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me.1987) (fraud). Pecuniary loss consists of "any loss of money or loss of something which money could acquire." *Masso v. United Parcel Service of America, Inc.*, 884 F.Supp. 610, 618 (D.Mass. 1995) (citing Black's Law Dictionary (1979)). The Court looks to see whether Plaintiffs suffered any economic, "out-of-pocket damages," as a result of the Dateline broadcast. *Jourdain*, 527 A.2d at 1307.

█ Kennedy offers no evidence of pecuniary loss. He alleges that he suffered injury to his reputation and emotional and physical health, but fails to point to any resulting monetary loss. Pls.' Statement of Material Facts ("SOF") ¶ 37. "[D]amages for emotional or mental pain and suffering are not recoverable" as pecuniary loss. *Jourdain*, 527 A.2d at 1307. This rule is consistent with "the well established view that fraud actions are essentially economic in nature and serve to protect economic interests." *Id.* Therefore, the Court grants summary judgment for Defendants on Kennedy's claims for negligent and fraudulent misrepresentation.

█ Veilleux, on the other hand, has offered evidence of pecuniary loss sufficient to survive summary judgment. Plaintiffs' expert, Reginald Perry, C.P.A., concluded, after reviewing Veilleux's business records, that three key customers of companies owned by Veilleux were lost soon after the Dateline program aired with a consequent loss of revenues of more than $250,000. Pls.' Ex. W. Perry offers the opinion that the broadcast was "a substantial contributing

factor" to the loss of one contract and, thus, to substantial decreases in Veilleux's net worth. *Id.;* Perry Dep. at 43–45. Veilleux testified that at least one customer "indirectly" indicated that it no longer wanted to do business with him because of the broadcast and that that same customer subsequently cut back its business with Veilleux by "99.9 percent." Veilleux Dep. at 393–397. Although Veilleux offers little in the way of direct evidence that the broadcast caused his loss of business, he has come forth with sufficient circumstantial evidence to justify an inference to that effect at this stage of the proceedings.

 Finally, Defendants argue that the promises allegedly made to Plaintiffs are not actionable under a theory of fraudulent misrepresentation. Defendants claim that the alleged representations do not constitute fraudulent misrepresentation (1) because they were expressions of opinion rather than fact, and (2) because they were promises for future performance.

Traditionally, the availability of a fraudulent misrepresentation action depended on whether the statement was one of fact or opinion. *Shine v. Dodge,* 130 Me. 440, 443, 157 A. 318 (1931) (citing *Martin v. Jordan,* 60 Me. 531 (1872)). Where the false statement constituted an expression of opinion there was no liability in an action for deceit. *Id.* A corollary to this rule was that "a breach of promise to do something in the future will not support an action of deceit, even though there may have been a preconceived intention not to perform." *Id.* (citing *Albee v. LaRoux,* 122 Me. 273, 119 A. 626 (1923)). From these two rules developed the general proposition that "[t]he fraud must be a misrepresentation of a past or present fact and not on a future happening or an expression of opinion." *Coffin v. Dodge,* 146 Me. 3, 76 A.2d 541, 543 (1950); *Wildes v. Pens Unlimited Co.,* 389 A.2d 837, 840 (1978) ("this Court has said on several occasions that an action for deceit must be based on misrepresentations of past or existing fact and not merely on broken promises for future performance").

 "The line between what is a statement of fact and of opinion is often shadowy."

*Shine,* 130 Me. at 444, 157 A. 318. The Law Court has consistently held that "[t]he relationship of the parties or the opportunity afforded for investigation and the reliance, which one is thereby justified in placing on the statement of the other, may transform into an averment of fact that which under ordinary circumstances would be merely an expression of opinion." *Wildes,* 389 A.2d at 840 (quoting *Shine,* 130 Me. at 444, 157 A. 318). Thus, an expression traditionally considered opinion may be considered an expression of fact, thereby becoming actionable, where the relationship of the parties, the extent of reliance, and the opportunity for investigation so warrant. Although "opinions" and "promises for future performance" are distinct, albeit occasionally overlapping concepts, the line between the two has been blurred by recent decisions which have analyzed future promises in the context of the fact-opinion dichotomy, and the oft-quoted *Shine* standard for converting unactionable opinion into actionable fact. For example, in *Wildes,* the plaintiff quit his job on a new employer's representations of a long-term employment relationship. *Wildes,* 389 A.2d at 839. Evidence showed that the defendant had no intention of keeping his promise when he made it. *Id.* The Court noted the general rule forbidding deceit actions for "broken promises for future performance," but decided that the future representations were ones of fact and not opinion in light of the relationship of the parties and the extent of reliance. *Id.* at 840. As such, under *Wildes* a promise of future performance may be an actionable statement of fact. The *Wildes* holding hinged on a finding that the plaintiff "was clearly at the mercy of the defendant" when the promises of future performance were made. *Id.*

In *Boivin v. Jones & Vining, Inc.,* 578 A.2d 187, 188–89 (Me.1990), the Law Court once again cited *Shine's* standard for transforming statements traditionally considered opinion into statements of fact in upholding a finding that a promise of future employment was actionable. However, the court also cited section 525 of the Restatement (Second) of Torts, which states:

One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

Restatement (Second) of Torts § 525.

 It is unclear from the opinion whether the Law Court, by citing section 525, intended to replace the common law fact-opinion distinction with the Restatement's broad standard which makes misrepresentations of opinions and future intentions actionable. What the holdings of *Boivin* and *Wildes* do make clear, however, is that a breach of a promise of future performance is now actionable, at least in certain circumstances, under a theory of fraudulent misrepresentation. *See* Donald N. Zillman, Jack H. Simmons & David D. Gregory, Maine Tort Law § 1104, at 11–8. In *Boivin*, 578 A.2d at 188–89, the court, without specifically identifying the basis for its decision, upheld a verdict against an employer who made a promise of future employment with the knowledge of its falsity.

Defendants rely on *Schott Motorcycle Supply, Inc. v. American Honda Motor Co.*, 976 F.2d 58, 64–65 (1st Cir.1992), in which the First Circuit held that under Maine law the misrepresentation at issue, consisting of opinions as to future events, was not actionable under a fraudulent misrepresentation theory. The court, however, recognized that statements of opinions as to future events could be actionable under different circumstances where they could justifiably be understood as assurances as to specific facts. *Id.* at 65. In *Schott*, the statements were not actionable because they were "nothing more than 'puffing' or 'trade talk,' upon which no reasonable person would rely." *Id.* The court concluded that "[u]nder these circumstances, plaintiff could not have justifiably understood the alleged misrepresentations to be assurances as to specific facts, rather than mere opinion." *Id.*

The alleged promises made here were more than vague opinions or "mere puffery." They were specific and repeated assurances by various NBC representatives, for the purpose of inducing Plaintiffs to cooperate, that the Dateline program would not involve PATT and would portray only the positive side of the trucking industry. Much like the plaintiffs in *Wildes*, Plaintiffs here were "clearly at the mercy of the defendant[s] insofar as any representations made" about the content and tenor of the program were concerned. *Wildes*, 389 A.2d at 840. Plaintiffs have provided evidence, sufficient at least to survive summary judgment, that the promises were made with the knowledge that they would not be honored. The record contains evidence that could support a jury finding that Plaintiffs justifiably relied on those promises and that Veilleux, as a result, suffered pecuniary harm. Under these circumstances, the Court is persuaded that Defendants' promises of future performance are actionable under a theory of fraudulent misrepresentation. Therefore, summary judgment is denied on Counts I and II as to Plaintiff Veilleux, and granted on Counts I and II as to Plaintiff Kennedy because of his failure to allege pecuniary loss.

## B. Defamation

 In Count III Plaintiffs allege defamation. Common law defamation in Maine consists of:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Lester v. Powers*, 596 A.2d 65, 69 (Me.1991) (citing Restatement (Second) of Torts § 558). Defendants contend that this case involves matters of "public concern" and that the First Amendment, therefore, imposes additional burdens on Plaintiffs. Indeed, if the allegedly defamatory statements involve matters of public concern, Plaintiffs must additionally prove the falsity of each statement, *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776, 106 S.Ct. 1558, 89 L.Ed.2d 783

(1986) ("the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern"), as well as "actual malice" insofar as they seek presumed and punitive damages. *Levinsky's, Inc. v. Wal–Mart Stores, Inc.,* 127 F.3d 122, 128 (1st Cir.1997) ("a private individual who seeks damages for a defamatory statement involving a matter of public concern cannot recover presumed or punitive damages absent a showing of actual malice").

As the First Circuit recently articulated in *Levinsky's:*

> The Supreme Court has roughly bisected the sphere of social commentary between matters of public concern, which are those that can be "fairly considered as relating to any matter of political, social, or other concern to the community," and matters of private concern, which are those that address "matters of only personal interest."

*Levinsky's,* 127 F.3d at 132 (quoting *Connick v. Myers,* 461 U.S. 138, 146–47, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). In order to determine whether a statement relates to a matter of public concern, a court must examine the statement's " 'content, form and context ... as revealed by the whole record.' " *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (quoting *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684). In conducting such an examination, "the relevant community need not be very large and the relevant concern need not be of paramount importance or national scope." *Levinsky's,* 127 F.3d at 132. Instead, " 'it is sufficient that the speech concern matters in which even a relatively small segment of the general public might be interested.' " *Id.* (quoting *Roe v. City of San Francisco,* 109 F.3d 578, 584 (9th Cir.1997)).

The Court is persuaded that under the broad standard set forth in *Levinsky's,* the allegedly defamatory statements at issue relate to a matter of public concern. The Dateline program and the statements made therein addressed issues of public safety on interstate highways and federal regulation of the trucking industry. Although Plaintiffs are correct that a defendant cannot create its own public controversy in order to claim First Amendment protection for defamatory statements, it is clear that the issue of long distance trucking and highway safety was matter of public concern long before the Dateline report.

Defendants next contend that Plaintiffs may not recover presumed or punitive damages because they cannot prove the allegedly defamatory statements were made with "actual malice." Actual malice is defined as either knowledge that the statement was false, or reckless disregard as to the statement's falsity. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Plaintiffs must be able to establish with convincing clarity that Defendants knew the statements were false or " 'entertained serious doubts as to the truth of [the] publication.' " *Michaud v. Inhabitants of Livermore Falls,* 381 A.2d 1110, 1114 (Me.1978) (quoting *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). The inquiry focuses on Defendants' subjective state of mind. *Id.* at 1113–14. Viewing the evidence in a light most favorable to Plaintiffs, the Court is unable to conclude at this stage of the proceedings that none of Defendants' statements were made with reckless disregard for the truth.

Defendants' strategy on summary judgment is to tackle each statement alleged as defamatory in Plaintiffs' Amended Complaint individually.[1] Defendants contend that Plaintiffs' claim should be limited to the nine statements specifically alleged in their Amended Complaint and argue that they are entitled to summary judgment because none of those statements are actionable. Plaintiffs respond that they are not limited to the statements alleged in their Amended Complaint, and in fact identify seventeen additional statements they claim are defamatory in their response to Defendants' motion.

---

1. Defendants put forth several arguments: (1) certain challenged statements are protected expressions of opinion or rhetorical hyperbole; (2) certain challenged statements are not "of and concerning" Plaintiffs; and (3) the remaining challenged statements are true.

Plaintiffs' Amended Complaint highlights nine statements but notes that the defamation claim is not limited to those nine. Amended Compl. ¶¶ 30, 46.

Plaintiffs cite *Saunders v. VanPelt,* 497 A.2d 1121, 1126 (Me.1985), and *Marston v. Newavom,* 629 A.2d 587, 591 (Me.1993), for the proposition that the complaint need not specifically identify each allegedly defamatory statement. *Saunders* and *Marston,* however, do not command such a conclusion. In these cases the Law Court held that while "material words, those essential to the charges made, must be proved as alleged, . . . some latitude may be allowed with respect to unimportant, connecting, or descriptive words." *Saunders,* 497 A.2d at 1126; *Marston,* 629 A.2d at 591 n. 7 (quoting *Saunders,* 497 A.2d at 1126). *Saunders* and *Marston* evidence a loosening of the "narrow standard" of *Estes v. Estes,* 75 Me. 478 (1883), which required that "the words must be proved strictly as alleged" in defamation cases. For example, *Saunders* concluded that proof that the defendant said "we had him here and we got rid of him" was sufficient to support a defamation claim where the complaint alleged that the defendant stated the plaintiff "had been dismissed by the CDC based upon his incompetence." *Saunders,* 497 A.2d at 1125–26. Finding "no appreciable difference in the words 'dismissed' and 'got rid of' in the context of the pleadings and the findings by the jury," the court chose not to apply the rule that material words must be proved as alleged. *Id.* There is a fundamental difference, however, between permitting a plaintiff some leeway in proving the words alleged and permitting a plaintiff to prove entire statements *not* alleged in the complaint. Although *Saunders* and *Marston* reflect liberalized modern pleading rules, they do not command the conclusion Plaintiffs contend they do.[2]

Ultimately, however, this issue is a matter of federal law. The sufficiency of the pleadings in a defamation case in federal court is governed by federal rules. "The manner of setting forth allegations is a matter of procedure, not substance, and a federal court [in a defamation case] cannot be bound by a state's technical pleading rules." *Asay v. Hallmark Cards, Inc.,* 594 F.2d 692, 698 (8th Cir.1979); *see also Ford v. Clement,* 834 F.Supp. 72, 78 (S.D.N.Y.1993), *aff'd without op.,* 29 F.3d 621 (2d Cir.1994) ("Rule 8(a), and not state law, controls the manner in which state law claims must be pled in federal court."); *Vantassell–Matin v. Nelson,* 741 F.Supp. 698, 707 (N.D.Ill.1990) ("[b]ecause rules as to the sufficiency of pleadings are procedural rather than substantive, under *Erie* this Court looks to federal rules of pleading," and federal rules "require plaintiffs alleging libel or slander to recite the precise language alleged to be defamatory").

"In pleading an action for defamation, 'the allegations of the complaint must afford defendant sufficient notice of the communications complained of to enable him to defend himself.'" *Ford,* 834 F.Supp. at 78 (quoting *Kelly v. Schmidberger,* 806 F.2d 44, 46 (2d Cir.1986)); *see also Asay,* 594 F.2d at 698 ("the use of In haec verba pleadings on defamation charges is favored in federal courts because generally the knowledge of the exact language used is necessary to form responsive pleadings"); 50 Am.Jur.2d Lib. & Sl. § 439 ("Federal pleading rules require that plaintiffs alleging libel or slander must set forth the precise language alleged to be defamatory; thus the defendant is provided with information necessary to defend, especially in the case of allegations of defamation per se."). In *Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724, 724 n. 6 (1st Cir.1992), the plaintiff, who referred to

---

**2.** In *Vahlsing Christina Corp. v. Stanley,* 487 A.2d 264, 267 (Me.1985), a case not cited by the parties, the Law Court held that "[t]he plaintiff's failure to specifically allege the date, month, and year of the publication of the alleged defamatory material is not necessarily fatal" when faced with a motion to dismiss. The court noted that "[i]n modern pleading practice, the purpose of the complaint is to provide the defendant with fair notice of the claim against him," and concluded

that plaintiffs adequately alleged the necessary elements of defamation to apprise the defendant of the nature of the claim against her. *Id.* While this case indicates that a complaint will not be held fatally deficient on a motion to dismiss where it does not specifically identify the defamatory material, it does not necessarily follow that Plaintiffs are entitled to add to their list of objectionable statements at will throughout the proceedings without amending their Complaint.

six allegedly defamatory articles in its complaint, was rebuffed by the court in its attempt to argue an additional article on appeal. The First Circuit noted:

> [i]n our view, a defendant is entitled to knowledge of the precise language challenged as defamatory, and the plaintiff is therefore limited to its complaint in defining the scope of the alleged defamation. If plaintiff wished to enlarge its case beyond the six articles originally challenged, it should have sought to amend the complaint.

*Id.*[3] In light of this precedent, the Court is persuaded that Plaintiffs are limited to the statements alleged in the Complaint and may not allege as defamatory any additional statements unless and until they amend their Complaint. To hold otherwise would either prevent Defendants from adequately responding to Plaintiffs' allegations or force them to prepare a defense to virtually every statement made in the two Dateline broadcasts at issue here.

 The Court, however, declines to individually analyze each statement alleged in the Complaint at this stage of the proceedings. The Court is persuaded that Plaintiffs have raised a genuine issue of material fact, at least insofar as some of the statements are concerned, sufficient to survive summary judgment on Count III.[4] To engage in a detailed analysis of each statement alleged would not promote the expeditious disposition of this case, especially in light of the strong possibility that Plaintiffs will seek leave to amend their Complaint to add to the list of allegedly defamatory statements. "A court, in its discretion in shaping the case for trial, may deny summary judgment as to portions of the case that are ripe therefor, for the purpose of achieving a more orderly or expeditious handling of the entire litigation." *Powell v. Radkins*, 506 F.2d 763, 765 (5th Cir.1975) (citing 6 J. Moore, Federal Practice ¶ 56.15(6), at 2427). "Rule 56(d), covering the situation in which the case cannot be fully adjudicated on the motion is qualified by the language 'if practicable.'" *Id.; see also* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2737 ("if the court determines that entering a partial summary judgment by identifying the facts that may no longer be disputed would not materially expedite the adjudicative process, it may decline to do so"). As such, Defendants' Motion for Summary Judgment on Count III is denied.

## C. Privacy Claims

In Counts IV and V Plaintiffs assert claims for invasion of privacy on theories of offensive publicity and false light.

### 1. Offensive Publicity

 Maine has adopted the Restatement (Second) of Torts standard for the tort of "publicity given to private life:"

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
>
> (a) would be highly offensive to a reasonable person, and
>
> (b) is not of legitimate concern to the public.

*Nelson v. Maine Times*, 373 A.2d 1221, 1225 (Me.1977) (quoting Restatement (Second) of Torts § 652D).

 Plaintiff Kennedy claims that in broadcasting the results of his drug test De-

---

3. Although the First Circuit did not identify the source of its conclusion, the fact that federal procedural law dictates the sufficiency of the pleadings in federal court and that the court prefaced its comment with "in our view" clearly indicates that the court applied federal law.

4. For example, Defendants contend that certain statements are not actionable because they are not "of and concerning" the Plaintiffs. The Law Court has held that "the 'of and concerning' requirement is an essentially factual issue that will almost always be material in a libel case." *Hudson v. Guy Gannett Broadcasting*, 521 A.2d 714, 716 (Me.1987). There is a sufficient factual dispute as to whether these statements meet the "of and concerning" requirement to preclude summary judgment. Moreover, Defendants admit that "[t]he number of hours that Kennedy drove, slept and was otherwise on or off duty on this and the remaining legs of the Dateline Trip [all of which are material facts] is a matter of dispute in this action." Defs.' Mot.Summ.J. at 8.

fendants publicized a private matter not of legitimate concern to the public.[5] Defendants respond that an interstate truck driver's failure of a random drug test required by federal law is a matter of legitimate concern to the public and that, in any event, Plaintiff Kennedy consented to the publication of the drug test results.

A claim for publication of private facts arises only when the facts revealed are indeed private.

> There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public. Thus, there is no liability for giving publicity to facts about the plaintiff's life that are matters of public record, such as the date of his birth, the fact of his marriage, his military record, the fact that he is admitted to the practice of medicine or is licensed to drive a taxicab, or the pleadings he has filed in a lawsuit. On the other hand, if the record is one not open to public inspection, as in the case of income tax returns, it is not public.

Restatement (Second) of Torts § 652D, comment b. Kennedy's failure of a drug test is not a matter of public record, nor did Kennedy leave the results "open to the public eye." To the contrary, due to their particularly intrusive nature, drug test reports are subject to strict confidentiality requirements under state and federal law. *See* 49 C.F.R. §§ 40.33–35; 26 M.R.S.A. § 685(3). As such, the Court is persuaded that Kennedy's drug test is a private matter. As a comment to the Restatement notes:

> Every individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself or at most reveals only to his family or to close personal friends. Sexual relations, for example, are normally entirely private matters, as are family quarrels, many unpleasant or disgraceful or humiliating illnesses, most intimate personal letters, most details of a man's life in his home, and some of his past history that he would

rather forget. When these intimate details of his life are spread before the public gaze in a manner highly offensive to the ordinary reasonable man, there is an actionable invasion of his privacy, unless the matter is one of legitimate public interest.

Restatement (Second) of Torts § 652D, comment b.

Defendants contend that Kennedy cannot, as a matter of law, establish the absence of a legitimate public interest in the results of his drug test. Defendants emphasize that Kennedy works in a heavily regulated industry and that Kennedy tested positive for illegal drugs that can affect driving ability.

In the only Maine case discussing the "matter of public concern" issue, *Loe v. Town of Thomaston,* 600 A.2d 1090, 1093 (Me.1991), the Law Court held that newspaper articles disclosing a town bookkeeper's resignation for personal reasons, a $10,000 settlement reached between the bookkeeper and the town, and the fact that the town's books were in disarray, dealt with a matter of public concern to the town's taxpayers and not private matters in which the bookkeeper could properly claim a protectable privacy interest. *Loe,* however, presented the court with a much different scenario than the one presented here because it involved the actions of a voluntary public official. As the Restatement comments:

> One who voluntarily places himself in the public eye, by engaging in public activities, or by assuming a prominent role in institutions or activities having general economic, cultural, social or similar public interest, or by submitting himself or his work for public judgment, cannot complain when he is given publicity that he has sought, even though it may be unfavorable to him.... [T]he legitimate interest of the public may extend beyond those matters which are themselves made public, and to some reasonable extent may include information as to matters that would otherwise be private.

---

5. The inquiry involved in determining matters of legitimate concern to the public for the purposes of the privacy tort of public disclosure of private fact is distinct from that used to determine whether a defamatory statement regards a matter of public concern.

Restatement (Second) of Torts § 652D, comment e. Contrary to Defendants' claim, working in a private, albeit heavily regulated, industry such as interstate trucking does not render one's life "public" thus open to increased scrutiny by the press.

While drug use among interstate truck drivers, because of the threat it poses to the safety of others on the highway, is clearly a matter of legitimate public concern, the identity of a single driver who tested positive is not, as a matter of law, an issue of legitimate concern to the public where there is nothing otherwise "newsworthy" about the driver or the particular test.[6] *See Y .G. and L.G. v. The Jewish Hospital of St. Louis,* 795 S.W.2d 488, 500 (Mo.Ct.App.1990) (finding that while an in vitro fertilization program and its success may well have been matters of public interest, the identity of the plaintiffs participating in the program was a private matter). Although it may be

> in the public interest to know about some area of activity, it does not necessarily follow that it is in the public interest to know private facts about the persons who engage in that activity. The fact that they engage in an activity in which the public can be said to have a general interest does not·render every aspect of their lives subject to public disclosure. To hold as a matter of law that private facts as to such persons are also within the area of legitimate public interest could indirectly expose everyone's private life to public view.

*Virgil v. Time, Inc.,* 527 F.2d 1122, 1131 (9th Cir.1975).

Defendants have presented no evidence that Kennedy ever drove under the influence of drugs or that he was an unsafe driver. They can point to no legitimate reason why the public should be informed that this particular driver tested positive for drug use. Were the Court to hold, as Defendants suggest, that private behavior of a truck driver constitutes a matter of legitimate public concern simply because such behavior may in theory affect his or her performance on the road, it would seriously impair the. right of privacy and open the door to further intrusion into the lives of private individuals whenever their behavior carries with it merely the potential to harm others.

> The line is to be drawn when the publicity ceases to be the giving of information to which a reasonable member of the public, with decent standards, would say that he had no concern. The limitations, in other words, are those of common decency, having due regard to the freedom of the press and its reasonable leeway to choose what it will tell the public, but also due regard for the feelings of the individual and the harm that will be done to him by the exposure.

Restatement (Second) of Torts § 652D, comment h.

 While the Court is persuaded that Kennedy's drug test is not, as a matter of law, an issue of legitimate public concern, "whether a fact is a matter of public interest is a question of fact to be decided by the jury." *Hawkins v. Multimedia, Inc.,* 288 S.C. 569, 344 S.E.2d 145, 146 (1986); *Virgil,* 527 F.2d at 1130 (the testing of facts against a standard founded on community mores is a function of the jury where the matter is not of legitimate public concern as a matter of law); *Jewish Hospital,* 795 S.W.2d at 503 (newsworthiness to be determined by jury); Restatement (Second) of Torts § 652D, comment h ("In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores.").

 Defendants argue that even if Kennedy's drug test is not a matter of legiti-

---

6. The Restatement includes within the scope of legitimate public concern matters of the kind customarily regarded as "news." Restatement (Second) of Torts § 652D, comment g. "News" includes "publications concerning homicide and other crimes, arrests, police raids, suicides, marriages and divorces, accidents, fires, catastrophes of nature, a death from the use of narcotics, a rare disease, the birth of a child to a twelve year old girl, the reappearance of one supposed to have been murdered years ago, a report to the police concerning the escape of a wild animal and many other similar matters of genuine, even if more or less deplorable, popular appeal." *Id.* The Court is persuaded that an individual truck driver's drug test results, without more, is not as a matter of law "newsworthy."

mate public concern, Kennedy consented to publication of the results. The question of whether an individual consented to the disclosure of private facts in an invasion of privacy case, so as to protect the defendant from any liability, is an issue of fact. *Kelly v. William Morrow & Co.*, 186 Cal.App.3d 1625, 231 Cal.Rptr. 497, 502–03 (1987); *Jonap v. Silver*, 1 Conn.App. 550, 474 A.2d 800, 807 (1984). In assessing Defendants' defense of consent, the Court views the facts in a light most favorable to Plaintiffs.

In the late fall of 1994, after Dateline completed filming Kennedy's cross-country trip, Vail and Francis received information that something had happened to Kennedy's job. When Francis contacted Kennedy to find out why he was no longer driving for Veilleux, Kennedy responded "it's a long story . . . I can't get into it with you." Kennedy Dep. at 237–38. However, Francis and Vail were able to persuade Kennedy to meet with them in person in Portland, Maine, on December 6, 1994, to discuss his employment status. At that meeting, after receiving assurances that the information would be kept "off the record," Kennedy told Francis and Vail that he tested positive for amphetamines and marijuana in a drug test administered days before the Dateline trip. Kennedy Dep. at 264–68.

Dateline was subsequently provided with a written statement dated December 19, 1994, prepared by Kennedy in anticipation of a lawsuit for wrongful termination that Kennedy was considering bringing against Veilleux, containing Kennedy's account of the drug test and the circumstances of his termination. In that statement, Kennedy denied ever taking amphetamines and discussed at length the administration of the drug test, his reaction to testing positive, and his attempts to clear his name.

In early January, 1995, Kennedy agreed to be re-interviewed by Francis on camera. When Francis first inquired about the drug test, Kennedy stated that he did not want to discuss the drug test on camera. The dialogue proceeded as follows:

Kennedy: "Don't mention the drug thing."

Francis: "Peter we have to talk about that. We have to talk about that Peter.

It's gonna be in the story. It has to be. It's there, it's done. OK?"

Kennedy: "I gotta go, I can't do this."

Francis: "You got to Peter."

Kennedy: "No, I can't."

Francis: "Peter, we talked about this the other night."

Knight Aff.Ex. A, Clip 27. Kennedy then changed the subject and the interview proceeded. Approximately five minutes later Francis revisited the drug test:

Francis: "I can't let the interview end without asking you directly. You failed a drug test?"

Kennedy: "They said I did, yes."

Francis: "I have to ask you, do you take drugs Peter?"

Kennedy: "No. I don't, no."

Francis: "Prior to your trip with Dateline, did you take amphetamines?"

Kennedy: "No, I did not."

*Id.* at Clip 28. At this point in the interview Kennedy discussed his reaction to the discovery that he failed the test, how he dealt with his employer, and his efforts to get a second test taken. Francis responded, "but the bottom line, Peter, is that when the second test was taken you still showed positive for marijuana, you still showed positive for amphetamines." Kennedy then stated, "yeah . . . right . . . yeah. What can I do? Take them to court ."

Defendants contend that Kennedy's on camera discussion of his drug test constituted consent to publicize that information. "There is an obvious and substantial difference between the disclosure of private facts to an individual—a disclosure that is selective and based on a judgment as to whether knowledge by that person would be felt to be objectionable—and the disclosure of the same facts to the public at large." *Virgil*, 527 F.2d at 1126; *see also Jewish Hospital*, 795 S.W.2d at 502 (participants in hospital's in vitro fertilization program, by attending hospital function commemorating success of program after being assured that function would be private and who twice refused interview with television news crew, which had been invited by hospital to attend, made no

express voluntary waiver of any right to privacy). In light of this distinction, the Ninth Circuit has concluded that "[t]alking freely to a member of the press, knowing the listener to be a member of the press, is not then in itself making public." *Virgil*, 527 F.2d at 1127. However, "[s]uch communication can be said to anticipate that what is said will be made public since making public is the function of the press, and accordingly such communication can be construed as a consent to publicize." *Id.*

▮ Although Kennedy's ultimate discussion of the drug tests with Francis on camera is evidence of implied consent to publicize the discussion, that act alone is not determinative. Disclosing private facts to a member of the media "is not dispositive as to whether . . . statements were private or public." *Green v. Chicago Tribune Co.*, 286 Ill.App.3d 1, 221 Ill.Dec. 342, 675 N.E.2d 249, 253 (1996) (concluding that a jury could find plaintiff's refusal to give a statement to a reporter sufficient to put the media defendant on notice that it was not to disclose to the general public statements subsequently made in the presence of reporter). Rather, "the analysis must focus on whether plaintiff alleged that [ ]he informed the [media] personnel that [ ]he wished to keep the content of those statements private with respect to the general public." *Id.; see also Hawkins*, 344 S.E.2d at 145 (no consent to publication where plaintiff did not terminate conversation with reporter immediately, but talked for only a few minutes and was never told he would be identified in an article).

▮ The facts as alleged by Plaintiffs suggest that Kennedy repeatedly made known his desire that Dateline not publicize his drug test and that Francis agreed to keep the disclosure confidential and "off the record." Kennedy once again emphatically stated his desire to keep the test private in the January, 1995, interview, yet Francis continued to press the issue, clearly hoping to get some reaction on film. Kennedy only addressed the matter after Francis, in no uncertain terms, stated that the drug test was "gonna be in the story" whether Kennedy liked it or not, and that Kennedy "ha[d] to talk about it" because "it's there, it's done." "Consent may be found where the evidence shows a voluntary agreement to do something proposed by another, and the party consenting possesses sufficient information and ability to make an intelligent choice." *Hawkins*, 344 S.E.2d at 146 (citing 15A C.J.S. *Consent*, at 573–577). "Although it is possible for the right of privacy to be waived or lost by a course of conduct that estops its assertion, . . . '[t]here can never be a waiver of the right of privacy, in the absence of knowledge and consent of the person entitled to waive.'" *Doe v. Mills*, 212 Mich.App. 73, 536 N.W.2d 824, 831 (1995) (citations omitted). "[A]n implied waiver requires a 'clear, unequivocal, and decisive act of the party showing such a purpose.'" *Id.* (quoting 62A Am.Jur.2d *Privacy* § 226). Under the circumstances, the Court cannot conclude at this point in the proceedings that Kennedy knowingly and intelligently consented to the publication of the drug test results.[7] Therefore, Defendants' motion is denied on Count IV.[8]

### 2. False light

▮ Through *Nelson*, 373 A.2d at 1223–24, Maine has adopted section 652E of the Restatement (Second) of Torts governing publicity that unreasonably places another in a false light. The Restatement provides:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to

---

7. Although Kennedy discussed the drug test in his December 19, 1994, written statement, that statement was prepared in anticipation of litigation never filed and it is unclear from the record whether Kennedy himself provided Dateline with that document or whether Dateline obtained it without Kennedy's consent through other sources.

8. To the extent Defendants argue that the First Amendment imposes additional restraints on Plaintiffs' offensive publicity claim, the Court notes that "unless it be privileged as newsworthy . . . the publicizing of private facts is not protected by the First Amendment." *Virgil*, 527 F.2d at 1128; *see also Gilbert v. Medical Economics Co.*, 665 F.2d 305, 308 (10th Cir.1981) ("dissemination of non-newsworthy private facts is not protected by the first amendment").

liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed.

Restatement (Second) of Torts § 652E.

 Defendants only argument regarding Plaintiffs' false light claim is that Plaintiffs cannot prove the "actual malice" element of the tort. As discussed above, Plaintiffs have raised a material issue of fact regarding actual malice. Defendants' motion as to Count V is therefore denied.

## D. Infliction of Emotional Distress Claims

In Counts VI and VII Plaintiffs assert claims of negligent and intentional infliction of emotional distress. Plaintiffs allege that Defendants negligently and fraudulently induced Plaintiffs to participate in a program designed to hold them out to ridicule and public humiliation.

 Intentional infliction of emotional distress requires proof of:

(1) intentional or reckless conduct which inflicts severe emotional suffering or would be substantially certain to result in such suffering; (2) conduct so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable; (3) the defendant's conduct must cause the plaintiff emotional suffering; and (4) the plaintiff's emotional suffering must be severe so that no reasonable person could be expected to endure it.

*Braverman v. Penobscot Shoe Co.*, 859 F.Supp. 596, 607 (D.Me.1994) (citing *Latremore v. Latremore*, 584 A.2d 626, 631 (Me. 1990); *Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me.1979)).

 Plaintiffs have failed to show that Defendants, through their alleged misrepresentations and invasions of privacy, engaged

in "atrocious and utterly intolerable" conduct so extreme and outrageous as to exceed all possible bounds of decency. Therefore, Defendants' motion is granted on Plaintiffs' claim of intentional infliction of emotional distress (Count VII).

 In order to prove a claim for negligent infliction of emotional distress, Plaintiffs must show that (1) Defendants were negligent; (2) Plaintiffs suffered emotional distress that was a reasonably foreseeable result of Defendants' negligent conduct; (3) and Plaintiffs suffered severe emotional distress as a result of Defendants' negligence. *Braverman*, 859 F.Supp. at 607 (citing *Bolton v. Caine*, 584 A.2d 615, 617–18 (Me. 1990)).

 Under Maine law Plaintiffs may not base a negligent infliction of emotional distress claim on statements alleged to be defamatory. *Rippett v. Bemis*, 672 A.2d 82, 87 (Me.1996) (concluding that an emotional distress claim based on allegedly defamatory statements is subsumed by defamation claim). "If defamation is proved, compensatory damages may include the elements of metal suffering, humiliation, embarrassment, effect on reputation and loss of social standing so far as they have been proved and may reasonably be presumed." *Id.* (citing *Saunders*, 497 A.2d at 1126). Therefore, to the extent Plaintiffs' emotional distress is a result of the publication of allegedly defamatory statements, they may not recover under a theory of negligent infliction of emotional distress. However, Plaintiffs allege as the source of their emotional distress, not the defamatory statements, but Defendants' negligent use of hollow promises to induce their cooperation and Defendants' failure to apprise them of the true nature of the Dateline report after it became clear that it would not be positive. The Court is persuaded that a duty of reasonable care could arise from Defendants' alleged assurances designed to coerce Plaintiffs' participation in their project.[9] *See Cameron v. Pepin*, 610 A.2d 279,

---

9. Defendants suggest that the imposition of a duty of reasonable care on members of the media would impermissibly restrain the news gathering and reporting process, and transform a news organization into an "insurer" of its interview subjects' emotional welfare. Imposing a duty of care on media organizations when they make misrepresentations in order to acquire informa-

42

282–83 (Me.1992). In addition, Plaintiffs have raised a question of material fact as to whether they suffered emotional distress so severe that no reasonable person could be expected to endure it and that such distress was foreseeable. Pls.' SOF ¶¶ 37, 38. Therefore, Defendants' motion is denied as to Count VI.[10] In light of the fact that Plaintiffs' have survived summary judgment on several of their tort claims, Defendants are not entitled to summary judgment on the derivative claim of loss of consortium (Count VIII).

### E. Punitive Damages

 Plaintiffs seek to recover punitive damages. Punitive damages may be awarded in Maine upon a showing of common law actual malice. Such malice exists "where the defendant's tortious conduct is motivated by ill will toward the plaintiff." *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me.1985). Punitive damages may also be awarded "where deliberate conduct by the defendant, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward a person injured as a result of that conduct can be implied." *Id.* A plaintiff must prove such malice by clear and convincing evidence. *Id.* at 1363. "The trial court must reject a claim for punitive damages as a matter of law unless the plaintiff presents adequate proof that the defendant acted in a sufficiently culpable manner." *Id.* at 1359. The common law malice stan-

dard adopted in Maine imposes a greater burden on plaintiffs than does the actual malice standard applied in defamation cases involving matters of public concern. To prove common law malice one must show more than the defendant's mere reckless disregard of the circumstances. *Id.* at 1361 ("reckless conduct alone cannot satisfy the element of malice necessary to justify an exemplary award"). Based on the evidence before it, the Court is persuaded that Plaintiffs cannot show by clear and convincing evidence that Defendants' conduct was motivated by ill will or was so outrageous so as to justify an implication of common law malice. Although Plaintiffs allege that NBC "deliberately" defamed and misled Plaintiffs they offer no direct evidence that supports this claim or suggests that Defendants' actions were motivated by ill will. Viewing the evidence in a light most favorable to Plaintiffs, the Court cannot conclude that Defendants' actions were so outrageous as to justify an inference of malice. Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' claim for punitive damages (Count IX) is granted.

### IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff Kennedy on Counts I and II and GRANTED as to all Plaintiffs on

tion does not expose the media to liability whenever sources of information are displeased. It simply means that *if* a media organization chooses to make a representation to an interview subject it must exercise reasonable care in doing so. If imposing a duty of care on media representatives inhibits truthful reporting, as Defendants claim, "it is no more than the incidental, and constitutionally insignificant, consequence of applying to the press a generally applicable law" that requires those who make certain kinds of representations to use reasonable care in doing so. *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671–72, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991) (holding that the First Amendment does not prohibit a source from recovering damages under promissory estoppel law for publishers' breach of promise of confidentiality given in exchange for information).

**10.** Contrary to Defendants' assertion, permitting a private figure plaintiff to assert a negligent infliction of emotional distress claim under the

circumstances presented here does not offend the First Amendment. *See Cohen*, 501 U.S. at 669–70, 111 S.Ct. 2513 (noting the "well established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news"). Defendants' reliance on *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 887 F.Supp. 811 (M.D.N.C.1995) is misplaced as that case (as well as the case upon which it relies, *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)) involved a public figure plaintiff who asserted non-defamation tort claims for the purpose of avoiding the constitutional limitations imposed on defamation claims. Here, the private figure Plaintiffs have alleged all of the common law and constitutional elements of defamation and their emotional distress claim is not based on the statements they allege to be defamatory, but rather on the repeated assurances Defendants made for the purpose of inducing their cooperation.

Counts VII and IX. Defendants' Motion for Summary Judgment is DENIED on all other Counts.

*SO ORDERED.*